**ALTA HEALTH STRATEGIES, INC., a Delaware corporation, Plaintiff and Appellant,**

**v.**

**CCI MECHANICAL SERVICE, a division of CCI Mechanical, Inc., a Utah corporation, Defendant and Appellee.**

No. 960331–CA.

Court of Appeals of Utah.

Dec. 27, 1996.

Certiorari Denied April 2, 1997.

J. Angus Edwards, Darci Dow, and Donald J. Purser, Salt Lake City, for Plaintiff and Appellant.

John L. Young and Barbara K. Berrett, Salt Lake City, for Defendant and Appellee.

Before BENCH, JACKSON and WILKINS, JJ.

WILKINS, Judge:

Alta Health Strategies, Inc. (Alta Health) appeals the trial court's order directing a verdict in favor of CCI Mechanical Service (CCI). We vacate and remand for a new trial.

## BACKGROUND

Because we are reviewing an order granting a directed verdict, we view and recite all facts and inferences drawn from the facts in the light most favorable to Alta Health, the nonmoving party. *See Nay v. General Motors Corp.*, 850 P.2d 1260, 1261 (Utah 1993).

In 1991, Alta Health owned and kept millions of dollars worth of sophisticated Unisys computer equipment in its computer room. Alta Health had obtained almost all its computer equipment from Unisys, which was responsible for providing computer maintenance and repair, and for recommending which computer equipment Alta Health should purchase. In addition, Unisys field engineers performed daily maintenance under a service contract.

For many years through 1991, the Unisys computers operated at all times. Because certain computer components were heat-sensitive, the air conditioning also operated at all times. The target temperature for the computer room was within a few degrees of seventy-two degrees Fahrenheit.

Because none of Alta Health's employees had experience or training in air conditioning, CCI performed all air conditioning service and maintenance work for the computer room for ten years up through 1991. Alta Health and CCI only communicated informally; they neither had formal meetings nor exchanged documents.

During 1991, Alta Health experienced a number of power outages, causing the loss of air conditioning and computer downtime. As a result, Alta Health sought to make its computers less vulnerable to air conditioning failures and asked CCI if it could install an automatic backup system for the computer room's air conditioning system. CCI represented that it could design and build such a system, and prepared a "proposal-contract" for the installation of the computer room's air conditioning automatic backup system. The installation of the new air conditioning system was called the changeover project.

CCI began the changeover project near the end of 1991. During the same time, CCI was also involved in a second, larger project to replace one of Alta Health's air conditioning chillers. In accordance with the parties' customary practice, Alta Health and CCI did not hold formal meetings or exchange written records during the changeover project. CCI knew that Alta Health's employees were neither knowledgeable nor experienced in air conditioning systems and that Alta Health was relying on it for the automatic backup work.

Russell Loudon, Alta Health's employee responsible for the computer room, was primarily responsible for the changeover project. CCI spoke to Loudon two to three times a week about the two air conditioning projects; however, Loudon did not have a good understanding of the automatic switchover mechanism involved in the changeover project. Loudon simply understood the automatic switchover mechanism would activate if a problem occurred. All that Loudon recalled CCI telling him regarding how the new system would work was that it would automatically activate if a problem occurred, in which case the computer operators would merely have to observe a panel with indicator lights, which CCI would finish later. Loudon understood CCI had nearly finished the changeover project because the project was supposed to automatically convert over on December 25, when only the indicator lights would remain to be installed. The indicator-light panels were not necessary for the automatic restart element of the automatic switchover system to work.

For many years until 1991, Alta Health had assigned employees to work in the computer room at all times, including holidays. However, in 1991, Loudon received permission from his supervisor, Kent Broadhead, the previous computer room manager, to allow the computer operators to take time off on Christmas day if the changeover project allowed the computer room to be unattended. Loudon subsequently confirmed with CCI

that the changeover project would allow the computer room to be unattended on December 25.

Like Loudon, David English, Alta Health's director of facilities, planning, and support, did not have a detailed understanding of the changeover project. Before English left for a week of Christmas vacation, a systems failure occurred and the switchover mechanism did not activate. While discussing this failure, CCI's service employee told English the automatic switchover mechanism had not activated because CCI was still waiting for an electronic part and the automatic switchover system was not yet complete. This discussion occurred in the hallway just outside of Broadhead's office while Broadhead was in a meeting. The CCI employee told English he would stay and talk to Broadhead, so English left. The CCI employee, however, did not tell Broadhead the automatic switchover system was not working and would not be working on December 25.

Based on his understanding of the changeover project, Loudon allowed the computer room to be unattended for part of Christmas day. However, he required computer operators to visit the room every hour. When Loudon visited the room shortly before 4:00 p.m., he discovered that an air conditioning failure had occurred because the room was ninety-five to ninety-six degrees Fahrenheit and the computer alarms, whistles, and lights had been activated. Loudon called and requested emergency service from CCI, but by the time CCI arrived, the air conditioning was operating again.

One of the computer components used in Alta Health's computer system was a Unisys head disk assembly (HDA). The HDAs in the computer system were not designed to operate when temperatures exceeded ninety degrees Fahrenheit or increased by more than five degrees per hour. The cost to replace all the HDAs in Alta Health's computer room would be a million-dollar expenditure.

About the same time Loudon was seeking emergency service from CCI, Unisys dispatched Jim Bolinder, the Unisys service engineer primarily responsible for the maintenance and upkeep of Alta Health's computer systems and equipment, to the computer room to analyze fatal system errors caused by the high room temperature. When Bolinder arrived, at least five HDAs were having problems, but he was still able to get the computers up and running. The next day, however, Bolinder found that three HDAs in the computer room had crashed or experienced fatal errors. Within one month of December 25, Unisys replaced nine damaged HDAs. The high temperatures on December 25 caused the excessive number of HDA failures.

Under the maintenance contract between Alta Health and Unisys, if an HDA failed and was damaged within the terms of the agreement, Unisys would replace the HDA at its own cost. Pursuant to the contract, Unisys had replaced all the failed HDAs during the months preceding December 25 at its own expense. In fact, Unisys had never previously charged a customer for replacing an HDA. However, after the incident on December 25, Unisys replaced only two of the nine damaged HDAs at its own expense. Unisys would not assume the cost to replace the other seven HDAs because those seven HDAs had not logged any errors in the thirty days before December 25 and were thus damaged by the heat. Unisys expressly informed Alta Health that because the HDA failures resulted from the heat caused by the computer room air conditioning malfunction, the failure was not within Unisys's control. Therefore, the repair and replacement of the damaged HDAs was beyond the scope of Alta Health's maintenance agreement with Unisys, and Alta Health was responsible for replacement or repair costs.

Of the approximately 150 to 200 HDAs in the computer room on December 25, one-half to two-thirds were middle-aged HDAs, and approximately twenty-four were of the newest model HDA. Unisys chose to replace the two middle-aged HDAs it paid for at its own expense with functioning middle-aged HDAs. However, the middle-aged HDAs were larger, slower, and more expensive than the newest model HDAs. Therefore, after the December 25 air conditioning malfunction, Alta Health replaced the seven middle-aged HDAs with the newest model HDAs.

The newest model HDA was roughly half as expensive as the older HDAs, so Alta Health saved considerable expense by purchasing the smaller, faster, and cheaper HDAs to replace the failed middle-aged HDAs. Dale Brown, the Unisys employee who was responsible for Alta Health's sales account and who was involved in replacing Alta Health's damaged Unisys computer equipment after December 25, testified the damaged HDAs were of some value and would have been returned to Unisys for repair and refurbishment.

Alta Health replaced the seven HDAs through two separate orders. The first order was for five HDAs. The unit price was $22,706, which was discounted for Alta Health to $19,300. The total discounted price for the entire order was $96,300. The second order was for two HDAs. The discount price was again $19,300 for each HDA, and the total price for the two HDAs was $38,600.

Altogether, Alta Health's orders totaled approximately $119,000 to replace the seven damaged HDAs with the new HDAs. In addition, Unisys charged Alta Health $933.46 for Bolinder's December 25 service call and $673.50 for a December 29 service call.

At trial, Alta Health presented evidence, including that recited above, alleging claims of breach of warranty, breach of contract, and negligent misrepresentation. After Alta Health rested its case, CCI made a motion for a directed verdict, which the trial court granted based on its conclusion that Alta Health presented insufficient evidence of damages and reasonable reliance. Alta Health appeals.

## ANALYSIS

■ Under Utah law, a party who moves for a directed verdict has the very difficult burden of showing *no* evidence exists that raises a question of material fact. *See Kleinert v. Kimball Elevator Co.*, 905 P.2d 297, 299 (Utah App.1995) (stating, in motion for directed verdict, "[w]here there is *any* evidence that raises a question of material fact,

no matter how improbable the evidence may appear, judgment as a matter of law is improper" (emphasis added)), *cert. denied,* 913 P.2d 749 (Utah 1996). Therefore, "[i]n directing a verdict, the [trial] court is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts," but instead must simply examine whether evidence raising questions of material fact has been presented. *Management Comm. of Graystone Pines Homeowners Assoc. on Behalf of Owners of the Condominiums v. Graystone Pines, Inc.,* 652 P.2d 896, 897 (Utah 1982).

■ In this case, the court entered only two conclusions to support its order for a directed verdict.[1] First, the court concluded Alta Health "failed to introduce sufficient evidence" from which the jury could determine the damages Alta Health sustained. Second, it concluded Alta Health "failed to introduce sufficient evidence" to allow the jury to find that Alta Health reasonably relied upon CCI's alleged negligent misrepresentation. Because a court should deny a motion for a directed verdict if *"any evidence* that raises a question of material fact, no matter how improbable [it] may appear," has been presented, *Kleinert,* 905 P.2d at 299 (emphasis added), in reviewing the trial court's order, we examine whether any evidence of damages and reasonable reliance was introduced at trial upon which the jury could base its verdict. Because evidence of both damages and reasonable reliance was introduced, we vacate the trial court's order and remand for a new trial.

## I. Damages

We first address whether Alta Health presented evidence of damages at trial. Because Alta Health's case was based on claims of breach of warranty, breach of contract, and negligent misrepresentation, we examine whether the record contains evidence of damages under each of these theories.

According to Utah contract law, which governs Alta Health's breach of warranty and breach of contract claims, damages are prop-

---

1. CCI also presents us with arguments regarding causation. However, because the trial court did not rule on this issue, it is not properly before us and we decline to address it.

erly measured by the amount necessary to "'place the nonbreaching party in as good a position as if the contract had been performed.'" *Anesthesiologists Assocs. v. St. Benedict's Hosp.*, 884 P.2d 1236, 1238 (Utah 1994) (citations omitted). Such damages may include "'general damages, i.e., those flowing naturally from the breach, and consequential damages, i.e., those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made.'" *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466 (Utah 1996) (quoting *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985)).

■ In this case, viewing the facts and inferences in the light most favorable to Alta Health, we hold that evidence was presented from which the jury could find Alta Health suffered damages from CCI's alleged breach, and that those damages were reasonably foreseeable by the parties when they contracted. First, Alta Health presented evidence of its damages. In its ruling, the trial court found that on December 25, 1991, the air conditioning system in the computer room stopped, causing the temperature to rise to ninety-five degrees Fahrenheit. The court also found that Unisys determined that five to seven HDAs required replacement, and Bolinder testified the HDA failures resulted from the high computer room temperature. The court also found Unisys's quoted replacement price for each HDA Alta Health replaced was $19,300. In addition, Alta Health presented evidence that Unisys wrote two orders for the HDAs Alta Health replaced following the December 25 event. The total price for the first order was $96,300, and the total price for the second order was $38,600. Evidence was also presented that Unisys charged Alta Health $933.46 and $673.50 for two service calls. This evidence, along with other evidence presented at trial, was sufficient to raise a genuine question of material fact as to whether Alta Health suffered damages resulting from CCI's alleged breach.

The trial court appears to have partially based its conclusion of insufficient evidence of damages on its finding that Alta Health failed to produce evidence of the extent and amount of price concessions Unisys gave Alta Health for converting to the new HDA units. However, it is sufficient, for purposes of a directed verdict, that Unisys testified it granted price concessions for the conversion and that Alta Health was charged a total of approximately $119,000 to replace the damaged HDAs. Viewing the facts and inferences in the light most favorable to Alta Health, a jury could conclude that the price concessions were included in the $119,000 total price.

■ The court's conclusion of insufficient evidence of damages also appears to be based on a number of other findings that reflect a confusion of the law. For example, the court found Alta Health failed to introduce evidence regarding the market value of HDAs. However, because Unisys was the sole supplier of HDAs, the jury—viewing the facts and inferences in the light most favorable to Alta Health—could conclude the price charged for HDAs was reasonable. As another example, the court found Alta Health failed to produce evidence that it paid to replace the HDAs; however, the law does not require proof of payment. The law simply requires that the nonbreaching party suffer a loss and that the breaching party pay to place the nonbreaching party in as good a position as if the contract had been performed. *See Anesthesiologists Assocs.*, 884 P.2d at 1238.

■ Second, viewing the facts and inferences in the light most favorable to Alta Health, we also conclude the jury could find that Alta Health's damages were reasonably foreseeable. CCI had provided all air conditioning service and maintenance work for Alta Health's computer room for at least ten years before the December 25 event. CCI knew or should have known of the computer equipment's sensitivity to heat and the expensive damage that would result if the room became too hot. CCI knew Alta Health's employees were not knowledgeable or experienced in air conditioning and that Alta Health was relying on it to complete the automatic switchover system. In addition, Alta Health presented testimony that Loudon, after conversing with Broadhead regarding the possibility of leaving the com-

puter room unattended on December 25, confirmed with CCI that the changeover project would allow the computer room to be unattended on December 25.

Numerous possible inferences could be drawn from these facts, including that Alta Health suffered reasonably foreseeable damages from CCI's breach. Therefore, the trial court erred by granting a directed verdict on the breach of warranty and breach of contract claims based on its conclusion that Alta Health failed to introduce sufficient evidence of damages.

In addition, "[n]ominal damages are recoverable upon a breach of contract if no actual or substantial damages resulted from the breach or if the amount of damages has not been proven." *Turtle Management, Inc. v. Haggis Management, Inc.*, 645 P.2d 667, 670 (Utah 1982). Likewise, a party who has breached a contract will not ordinarily escape liability merely because the amount of damages is uncertain. *Gould v. Mountain States Tel. & Tel. Co.*, 6 Utah 2d 187, 193, 309 P.2d 802, 805–06 (1957); *accord Terry v. Panek*, 631 P.2d 896, 897–98 (Utah 1981). Therefore, even if the amount of damages was not proven, the court still should not have granted a directed verdict on the breach of warranty and breach of contract claims.

■ The trial court also erred in concluding insufficient evidence of damages was presented regarding Alta Health's negligent misrepresentation claim. "The proper measure of damages in an action for negligent misrepresentation is that 'necessary to compensate the plaintiff for the pecuniary loss to him [of] which the misrepresentation is the legal cause.'" *Forsberg v. Burningham & Kimball*, 892 P.2d 23, 27 (Utah App.1995) (quoting Restatement (Second) of Torts § 552B(1) (1976)). Therefore, to prove damages under this claim, Alta Health simply needed to show it suffered a pecuniary loss caused by CCI's negligent misrepresentation.[2] Although such damages may not be determined by speculation, they also need

not be precisely determined. The Utah Supreme Court explained:

> It is well settled that, although the plaintiff has the burden of proving the fact, causation, and amount of damages, he need only do so with reasonable certainty rather than with absolute precision. "[A]lthough damages may not be determined by speculation or guesswork, evidence allowing a just and reasonable estimate of the damages based on relevant data is sufficient."

*Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 784 P.2d 475, 478 (Utah App. 1989) (citations omitted).

As we have already discussed in detail, when viewing the facts and inferences in the light most favorable to Alta Health, Alta Health presented sufficient evidence of the damages it suffered to allow a jury to determine Alta Health's damages without resorting to undue speculation.

## II. Reasonable Reliance

■ We next examine whether evidence of reasonable reliance was presented to support Alta Health's claim of negligent misrepresentation. *See Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986) (listing reasonable reliance as element of negligent misrepresentation). Alta Health presented evidence that Loudon had a series of conversations with CCI regarding the changeover project, including a conversation in which he was told that by December 25, the only missing part to the automatic switchover system would be a light panel, which Loudon did not think was necessary for the system to switch over if a problem occurred. CCI had worked with Alta Health for many years, and acknowledged that Alta Health employees did not understand the air conditioning system and that Alta Health relied on CCI for its service. Loudon testified he only allowed the computer room to be unattended after he had several conversations with CCI employees and was confident that the automatic switchover

---

2. Examples of what these damages may include are: (a) "the difference between the value of what [the plaintiff] has received in the transaction and its purchase price or other value given" and (b) "pecuniary loss suffered … as a consequence of the plaintiff's reliance ·upon the misrepresentation." Restatement (Second) Torts § 552B(1)(a) & (b); *accord Forsberg v. Burningham & Kimball*, 892 P.2d 23, 27 (Utah App. 1995).

system would be operational. Even the trial court found that "Loudon testified that he 'understood' from a conversation with a CCI employee, either Greg Porter or George Murdoch, that the automatic switching system was operational as of December 25, 1991."

Although evidence also exists which does not support a finding of reasonable reliance, we must view all facts and inferences drawn from the facts in a light most favorable to Alta Health. Because, taking the evidence in the light most favorable to Alta Health, we cannot say that reasonable jurors could not find in its favor, we conclude the trial court erred in ruling, as a matter of law, that insufficient evidence of reasonable reliance was presented at trial. We refuse to prevent this issue from going to the jury when evidence exists upon which a reasonable jury could infer reasonable reliance. *Cf. Nay v. General Motors Corp.*, 850 P.2d 1260, 1264 (Utah 1993) (declining to prevent issue of causation from going to jury).

## CONCLUSION

We therefore conclude that because Alta Health submitted evidence sufficient to raise genuine issues of material fact regarding damages and reasonable reliance, the trial court erred by granting CCI's motion for a directed verdict. Consequently, the directed verdict is vacated and the case is remanded for a new trial.

BENCH and JACKSON, JJ., concur.