2013 UT App 176

## THE UTAH COURT OF APPEALS

MICHAEL N. MACRIS,
Plaintiff and Appellee,

*v.*

SEVEA INTERNATIONAL, INC.; *JERRY SAXTON;*
*KATIE SAXTON; MICHAEL CONNOR; SEVEA INTERNATIONAL*
*PRODUCTIONS, LLC; AMERICAN EQUITIES MANAGEMENT, LLC;*
*AND ANGELS OF AMERICA, LLC,*
Defendants and *Appellants.*

Opinion
No. 20110439-CA
Filed July 18, 2013

Third District, Salt Lake Department
The Honorable Paul G. Maughan
No. 070903010

Zachary E. Peterson and Steven H. Bergman,
Attorneys for Appellants
Robert K. Hilder, Attorney for Appellees

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
concurred.

McHUGH, Judge:

¶1　Jerry Saxton, Katie Saxton, Michael Connor, Sevea
International Productions, LLC, American Equities Management,
LLC, and Angels of America, LLC (collectively, Appellants) appeal
the trial court's entry of judgment in favor of Michael N. Macris.
We affirm in part, reverse in part, and remand for further
proceedings consistent with this opinion.

BACKGROUND

¶2     Macris and Christina McNally formed Sevea International, Inc. (Sevea) in February 2006, for the purpose of marketing and selling, among other products, customized artificial fingernails.[1] In developing the artificial fingernails, Sevea utilized certain patents, inventions, and discoveries that were transferred to Sevea by Artificial Nail Technologies, Inc. (ANT) pursuant to an asset contribution agreement dated February 28, 2006. The asset contribution agreement also required Sevea to issue ANT ten million shares of Sevea stock. Additionally, Dr. Craig Gifford, a principal and shareholder in ANT and an inventor on the patents, was to assign those patents to Sevea by March 27, 2006.

¶3     In March 2006, Jerry Saxton invested $250,000 in Sevea, and on April 15, 2006, Macris became a shareholder of Sevea. However, on April 17, 2006, ANT elected to terminate the asset contribution agreement on the ground that Sevea never issued the ten million shares of Sevea stock to ANT. Shortly thereafter, ANT filed a federal lawsuit (the Federal Lawsuit) against Sevea and Macris seeking the return of its intellectual property held by Sevea and a declaratory judgment that the asset contribution agreement had terminated.

¶4     In June 2006, Jerry Saxton invested another $500,000 in Sevea. By August 4, 2006, Macris owned six million shares, Jerry Saxton and his wife, Katie Saxton, together owned six million shares, and McNally owned one-and-a-half million shares of Sevea stock. Macris served as Sevea's Secretary/Treasurer and as a director, Jerry Saxton served as Sevea's CEO and as a director, and Katie Saxton served as Sevea's marketing director. At about that time, Sevea entered into an employment agreement with Gifford that included a non-compete provision precluding him from

---

1. McNally has never been a party to these proceedings.

working for a competing artificial fingernail-making entity for three years after termination of the employment agreement.

¶5     On or about September 12, 2006, Sevea entered into an agreement with Macris Enterprises, LLC, making it the base level of a multi-level marketing program selling Sevea products under which all other distributors would be formed. On or about September 29, 2006, Macris, McNally, and the Saxtons entered into a voting agreement (the Voting Agreement) that required Macris and Jerry Saxton to agree on all decisions for the operation of Sevea. The Voting Agreement did not include procedures to be followed in the event that Macris and Jerry Saxton became deadlocked.[2] By October 2006, Sevea began selling its product in earnest.

¶6     By December 2006, problems had developed between Macris and Jerry Saxton regarding the management of Sevea. After attempts to resolve those issues failed, Jerry Saxton unilaterally declared Sevea closed, terminated all of Sevea's employees, and moved all of the company's manufacturing equipment, computers, intellectual property, and other assets to a different office location in Utah. Jerry Saxton formed a new company called Sevea International Productions, LLC (Sevea Productions), rehired Gifford and several other Sevea employees, and continued to develop, manufacture, and sell the same type of artificial fingernails previously sold by Sevea. Sevea Productions also used the same trade name and telephone number as Sevea and wrote to Sevea's distributors suggesting that they become wholesale distributors for the new company.

¶7     On February 22, 2007, Macris filed a complaint in the Third District Court asserting a derivative action on behalf of Sevea against the Saxtons, Gifford, and another party not involved in this

---

2. Because the Voting Agreement also provided that only Macris and Jerry Saxton could vote, this omission was significant.

appeal for breach of fiduciary duties, conversion of corporate assets, and interference with Sevea's prospective contractual rights.[3] Macris simultaneously sought a temporary restraining order and preliminary injunction prohibiting the Saxtons, Gifford, and Sevea Productions from violating various agreements, including Gifford's non-compete agreement, and requiring the return of Sevea's equipment, computers, intellectual property, records, and other assets.

¶8    The trial court granted the temporary restraining order against Gifford on March 2, 2007, and held an evidentiary hearing on the motion for preliminary injunction on April 11 and 12, 2007. The trial court issued a memorandum decision granting the preliminary injunction on behalf of Sevea against Gifford, the Saxtons, and Sevea Productions. The preliminary injunction enjoined Gifford from violating the non-compete agreement and enjoined the Saxtons and Sevea Productions from "developing, manufacturing, and/or selling custom fitting, reusable, mass-produced fingernails"; "from engaging in any business enterprise utilizing deceptively similar names to [Sevea]"; "from obtaining, using, or disclosing any confidential, proprietary trade secret information belong[ing] to [Sevea]"; and "from removing, hiding, secreting, harming, injuring, or in any manner altering the inventory, sales materials, accounting books and records, [d]istributor files, customer files, fixtures, and equipment, and any and all other documents and assets of [Sevea]." The injunction also required the Saxtons and Gifford to relinquish all Sevea inventory to Macris, for and on behalf of Sevea.

¶9    The Saxtons and Gifford filed an emergency motion to modify the preliminary injunction, asking the trial court "to clarify

---

3. Subsequently, on April 14, 2008, Macris filed an amended verified complaint that added individual claims for, among other things, malicious prosecution against the Saxtons and Gifford and slander against Jerry Saxton.

that Sevea will be managed and controlled in accordance with the Voting Agreement and that the [preliminary injunction] is not to be construed as termination [of the Voting] Agreement." They also filed a motion requesting that a custodian be appointed to whom the Sevea assets could be returned, indicating that "[a] custodian could ensure that Sevea could continue to operate to provide employment for Sevea employees and produce nail products for sale by Sevea's distributors while Sevea's directors resolve their internal disputes." In response, Macris argued that the Voting Agreement was terminated because Sevea had ceased doing business or, in the alternative, that he should be appointed as the custodian if the trial court decided that a custodian was appropriate.

¶10    On July 16, 2007, the trial court approved the appointment of a custodian and ordered the parties to agree upon an individual to serve in that capacity within ten days, but it declined to determine the continuing validity of the Voting Agreement at that time. The parties agreed to designate Gil Miller as the custodian. Subsequently, the Saxtons and Gifford filed several motions seeking to modify or dissolve the preliminary injunction, claiming that it was overbroad and unnecessary based on the appointment of the custodian and other changed circumstances. The trial court denied these motions.

¶11    Instead of turning Sevea's assets over to the custodian, the Saxtons and Gifford removed them from Sevea's Utah facilities. It was later discovered that in May and August 2007, shortly after the appointment of the custodian, Jerry Saxton and Gifford moved Sevea's manufacturing equipment, computers, files, and business records to Texas. In response, Macris filed a motion to hold the Saxtons and Gifford in contempt for violating the preliminary injunction. The trial court held an evidentiary hearing on that motion on December 17, 2007.

¶12    On December 19, 2007, the trial court entered an order for civil contempt (the First Contempt Order) finding that

"[Appellants'] attorney . . . admitted in open court [that] . . . [Jerry] Saxton and . . . Gifford removed equipment, records and computers in violation of the Court's Preliminary Injunction Order." The trial court further found that Appellants had continued to produce artificial fingernails after the preliminary injunction was issued; that Appellants sold the nails to individuals and nail salons who comprised the same customer base that had previously purchased from Sevea; that the name Sevea had been used by Appellants on buildings in Texas; and that "[t]he same pictures owned and used by Sevea in advertising brochures are now in the public market place again promoting nail products, despite [Appellants'] claims they have no knowledge thereon," which the court found not to be credible. In addition, the trial court found that Gifford's employment was "continued through a series of manipulations, including . . . forming new companies (including but not limited to [Angels of America, LLC,] and [American Equities Management, LLC,]) of which . . . [the] Saxtons and . . . Gifford and his wife are owners," and that these companies were "a sham and [were] an attempt to try to avoid the Preliminary Injunction." The trial court further found that Appellants "kept . . . equipment and records in Texas, computers and records . . . have not [been] returned to the possession of the custodian of [Sevea]," and that "Gifford has removed information and data from computers and has made copies of the information or placed it on other computers in his possession."

¶13     As a sanction for this contemptuous conduct, the trial court ordered that the Saxtons and Gifford each pay a $1,000 fine and sentenced each of them to thirty days in jail. However, the trial court suspended the sentence to allow the Saxtons and Gifford an opportunity to purge their contempt. The trial court also ordered Appellants to comply with all the terms of the preliminary injunction, including Gifford's non-compete agreement, and ordered them to return the balance of the equipment, computers, servers, intellectual property, and all records and documents to the custodian within seven days.

¶14    In March 2008, Macris filed a second motion seeking to hold Appellants in contempt of the preliminary injunction order as well as the trial court's First Contempt Order. Among other things, Macris's motion alleged that Appellants had failed to return Sevea's equipment and to pay the court-imposed fees. Subsequently, a forensic evaluation of Gifford's laptop computer indicated that scrubbing and deletion efforts had been employed to purge information from it. Specifically, Macris alleged that hundreds of thousands of electronic files were deleted from the laptop as well as Sevea Productions' server in violation of the trial court's First Contempt Order.

¶15    The trial court held an evidentiary hearing on October 21, 2008, to address the various allegations of contempt. Michael Connor, a former Sevea employee whom Jerry Saxton terminated and then rehired to work for Sevea Productions, testified that Gifford had directed him to delete the files from Sevea Productions' server. Because Jerry Saxton and Gifford's attorney told Gifford that he need not appear, Gifford was not present at the hearing. At the conclusion of the hearing, the trial court issued an oral ruling (the Second Contempt Order) holding Gifford in contempt and requiring him to serve a thirty-day jail sentence.

¶16    On August 15, 2008, Macris moved to strike Appellants' pleadings due to their spoliation of evidence and for committing fraud upon the trial court. After briefing and an evidentiary hearing, the trial court denied Macris's motion, noting that "certain of the [Appellants'] conduct in this matter has indeed bordered on fraud upon this Court and upon the other parties to this action" but concluding that striking Appellants' pleadings was "simply too severe a sanction" at that time.

¶17    Macris filed a renewed motion for contempt against Saxton on December 18, 2008. Before the trial court could hold an evidentiary hearing on Macris's renewed contempt motion, additional incidents occurred. On March 17, 2009, the trial court held a hearing and issued an order that Macris's expert witness be

allowed to enter the Saxtons, American Equities Management, and Sevea Productions' premises in Texas to conduct forensic imaging of all computer hard drives and storage devices. The court also ordered Jerry Saxton to make his personal laptop computer available for inspection. The computers and equipment were to be made available no later than March 19, 2009. Despite the trial court's order, Appellants denied Macris's expert access to the computers. As a result, the trial court extended the time to make all of the computer hard drives and storage devices available for forensic imaging until March 25, 2009. The trial court also ordered that the Saxtons be available for depositions during a six-day period in April 2009 and set a May 5 and 6, 2009 hearing date on Macris's renewed motion for contempt.

¶18    The Saxtons failed to appear for depositions during the designated period. The Saxtons and Connor failed to appear at the May 5 and 6, 2009 contempt hearing. However, Gifford and his wife did appear. Gifford testified that while he had scrubbed electronic files from his laptop computer, he had neither deleted nor ordered the deletion of any files from Sevea Productions' server. Furthermore, Gifford indicated that he was physically present in Utah when the deletion of the files from Sevea Productions' server took place in Texas.

¶19    After the hearing, the trial court issued an order and entry of judgment (the Final Contempt Order). The trial court found, among other things, that the Saxtons had violated the trial court's order to appear for depositions during the designated six-day period; that Jerry Saxton and Connor had committed perjury during the course of the October 21, 2008 hearing, taking advantage of the fact that Gifford had been told by Jerry Saxton and his attorney that he need not appear; and that Appellants had violated the trial court's orders by refusing Macris's expert access to a portion of the building where the artificial nails were being manufactured. In all, the Final Contempt Order includes over fifty findings involving multiple instances of contempt, spoliation of evidence, discovery violations, and acts of perjury by Appellants

from the date of issuance of the preliminary injunction in May 2007 through August 2009. Based on Appellants' repeated contemptuous conduct, the trial court struck their pleadings and entered default judgment against them.[4]

¶20    In September 2009, the trial court held a bench trial on the issues of damages. The Saxtons again failed to appear. Both Macris and Appellants offered expert testimony on the value of the lost business opportunity and ownership of Sevea, as well as the loss of income from Macris's distributorship interest. While Macris's expert testified that the total loss amounted to $5,926,000, including $4,400,000 attributable to the value of Sevea, Appellants' expert valued Sevea at $227,712. In addition, Macris testified concerning the damages he had suffered due to the Saxtons' slander and malicious prosecution. Based on the evidence presented, including Macris's testimony regarding the Saxtons' wealth, the trial court entered a memorandum decision on December 4, 2009, awarding Macris and Macris Enterprises damages "[w]ith respect to Macris Enterprises' lost distributorship income and, as a corollary, the value of the ownership interest in Sevea." The trial court calculated Macris's lost distributorship income and ownership interest in Sevea by determining the value of the company immediately before Appellants misappropriated its assets and then awarded Macris half that amount. The trial court also awarded Macris actual damages for slander per se, malicious prosecution,[5] and punitive damages for "misconduct [that was] ongoing, egregious and reprehensible."

---

4. Appellants' present counsel did not participate in the trial proceedings that resulted in the contempt sanctions. Counsel for both sides on appeal have performed professionally before this court.

5. Although the court entered judgment for abuse of process, the amended verified complaint actually asserts a claim for malicious prosecution. For purposes of our analysis, we refer to this claim as malicious prosecution.

¶21    On April 1, 2011, the overall award was reduced to a written judgment in favor of Macris against Appellants for $113,856, jointly and severally, "as a result of default being entered against them [for] . . . breaches of fiduciary duties, conspiracy to breach fiduciary duties, conversion, and interference with contractual relations"; judgment in favor of Macris in the amount of $10,000 against the Saxtons, jointly and severally, for malicious prosecution; judgment in favor of Macris in the amount of $100,000 against Jerry Saxton for slander per se; and judgment in favor of Macris for $1,119,280 in punitive damages against Appellants, jointly and severally, "for their willful and malicious conduct." The trial court also awarded Macris $300,000 in attorney fees. Appellants filed a timely appeal from the judgment against them.

ISSUES AND STANDARDS OF REVIEW

¶22    Appellants contend that the trial court exceeded its discretion by striking their pleadings and entering default judgment against them. "As a general rule, district courts are granted a great deal of deference in selecting discovery sanctions, and we overturn a sanction only in cases evidencing a clear abuse of discretion." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. Furthermore, a trial court has inherent authority to strike a party's pleadings as a sanction for contempt. *Chen v. Stewart*, 2005 UT 68, ¶ 43, 123 P.3d 416 ("[A] court has the inherent authority to strike a party's pleadings and enter a default judgment if the party engages in conduct designed to improperly influence the court's decision on the merits of the case, such as perjury or obstruction of justice, or if the conduct itself tends to demonstrate bad faith or a lack of merit.").

¶23    Appellants next argue that the trial court erred when it denied their motion to dismiss the derivative proceedings. "The propriety of a trial court's denial of a motion to dismiss is a question of law that we review for correctness." *Buckner v. Kennard*, 2004 UT 78, ¶ 9, 99 P.3d 842. "Only if it is clear that the claimant is

not entitled to relief under any state of facts that could be proven to support the claim should a motion to dismiss be granted." *Id.*

¶24 Appellants also claim that the trial court exceeded its discretion in granting Macris's motion for a preliminary injunction and then failing to dissolve it based on new facts and changed circumstances. "A trial court's decision to grant a preliminary injunction is reviewed for abuse of discretion." *Chen v. Stewart*, 2004 UT 82, ¶ 27, 100 P.3d 1177. "[I]n granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact . . . , [which] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a).

¶25 Appellants further claim that the trial court exceeded its discretion in denying their motion for a stay pending resolution of the Federal Lawsuit. We review a trial court's decision to deny a motion to stay for abuse of discretion. *Lewis v. Moultree*, 627 P.2d 94, 96 (Utah 1981) ("It lies within the inherent powers of the courts to grant a stay of proceedings. It is a discretionary power . . . .").

¶26 Last, Appellants contend that the trial court erred in awarding actual damages unsupported by the record and in awarding punitive damages that are excessive and also unsupported. "We review for an abuse of discretion the trial court's determination that [Macris] failed to introduce sufficient evidence to establish damages, and we will not overturn the trial court's decision unless there was no reasonable basis for the decision." *See Richards v. Brown*, 2009 UT App 315, ¶ 12, 222 P.3d 69. "Whether punitive damages [should be] awarded is generally a question of fact within the sound discretion of the [fact finder], and will not be disturbed absent an abuse of discretion." *Long v. Stutesman*, 2011 UT App 438, ¶ 14, 269 P.3d 178 (alterations in original) (citation and internal quotation marks omitted). In *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), *holding modified by Westgate Resorts, Ltd. v. Consumer Protection*

*Group, LLC*, 2012 UT 55, 285 P.3d 1219, the Utah Supreme Court listed seven factors to be considered in assessing the amount of punitive damages awarded. *Id*. at 808; *see also Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 32, 82 P.3d 1064. The Utah Supreme Court "has adopted a de novo standard for reviewing jury and trial court conclusions under the *Crookston* factors." *Smith*, 2003 UT 41, ¶ 31.

## ANALYSIS

### I. Default Judgment

#### A.    Dismissal as a Sanction

¶27    Appellants argue that the trial court exceeded its discretion by striking their pleadings and entering default judgment against them. Rather than challenging the trial court's finding that Appellants were in contempt for numerous violations of the trial court's prior orders, or even mentioning the many discovery violations that the trial court relied on in striking their pleadings, Appellants argue that their conduct was a result of the trial court's error in permitting Macris to bring the derivative action and its abuse of discretion in issuing the preliminary injunction.

¶28    Appellants' attempt to shift responsibility for their blatant violations of binding orders to the trial court is entirely inappropriate. As the Utah Supreme Court has made clear, "[t]he proper method for contesting an adverse ruling is to appeal it, not to violate it." *State v. Clark*, 2005 UT 75, ¶ 36, 124 P.3d 235. Moreover, "[t]he orderly and expeditious administration of justice by the courts requires that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *Maness v. Meyers*, 419 U.S. 449, 459 (1975); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947) ("[A]n order issued by a court with jurisdiction over the subject matter and

person must be obeyed by the parties until it is reversed by orderly and proper proceedings. This is true without regard even for the constitutionality of the Act under which the order is issued." (citation omitted)). Thus, even if the trial court did err or exceed its discretion during the trial court proceedings, Appellants were obligated to comply with the trial court's orders and assert their challenges through orderly and proper proceedings. Appellants' dissatisfaction with the trial court's orders does not relieve them from the consequences of their numerous willful violations of those orders. *See State v. Cherryhomes*, 840 P.2d 1261, 1264 (N.M. Ct. App. 1992) ("Willful violation of a court's order without testing its validity through established processes directly affects a court's ability to discharge its duties. Such a direct affront to the power of the court cannot be tolerated." (citations omitted)).

¶29 In reviewing Appellants' challenge to the sanction imposed for the violations of the trial court's orders, we first "consider whether the district court was justified in ordering sanctions." *See PC Crane Serv., LLC v. McQueen Masonry, Inc.*, 2012 UT App 61, ¶ 32, 273 P.3d 396; *see also* Utah R. Civ. P. 37(e)(2) ("[T]he court in which the action is pending may impose appropriate sanctions for the failure to follow its orders, including . . . dismiss[ing] all or part of the action, strik[ing] all or part of the pleadings, or render[ing] judgment by default on all or part of the action . . . ."); *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶¶ 22–24, 199 P.3d 957 (requiring a finding that the party's behavior merits sanctions under rule 37 of the Utah Rules of Civil Procedure). "Sanctions are warranted [under rule 37] when (1) the party's behavior was willful; (2) the party has acted in bad faith; (3) the court can attribute some fault to the party; or (4) the party has engaged in persistent dilatory tactics tending to frustrate the judicial process." *Kilpatrick*, 2008 UT 82, ¶ 25 (citation and internal quotation marks omitted). If we deem the sanctions justified, "[w]e then review the type and amount of sanctions for abuse of discretion." *PC Crane*, 2012 UT App 61, ¶ 32. Although dismissing an action is a severe sanction, "it is clear from the language of rule 37 that it is within a trial court's discretion to impose such a sanction." *Allen v.*

*Ciokewicz*, 2012 UT App 162, ¶ 32, 280 P.3d 425 (citation and internal quotation marks omitted); *accord Daynight, LLC v. Mobilight, Inc.*, 2011 UT App 28, ¶ 3, 248 P.3d 1010 (mem.). In order to meet their burden in showing that the trial court exceeded its discretion in striking their pleadings and entering judgment against them, Appellants "must show either that the sanction is based on an erroneous conclusion of law or that the sanction lacks an evidentiary basis." *See SFR, Inc. v. Comtrol, Inc.*, 2008 UT App 31, ¶ 14, 177 P.3d 629 (citation and internal quotation marks omitted). Appellants have not met this burden.

¶30    The trial court determined that Appellants' misconduct was ongoing, egregious, and reprehensible. The record overwhelmingly supports that assessment as well as the trial court's decision to enter default judgment. The trial court made extensive factual findings that span over twenty-three pages of the Final Contempt Order, which outline the numerous discovery violations and contemptuous actions resulting from Appellants' willfulness, bad faith, fault, and persistent dilatory tactics. Furthermore, the trial court acknowledged the severity of the sanction but specifically determined that Appellants' conduct warranted striking their pleadings and entering default against them. In particular, the trial court indicated that the Appellants had been "previously and sufficiently given full and appropriate notice and warning of the significance and severity of the Court's sanctions available to it." The trial court also documented the "great lengths" to which it had gone "to give warnings and impose non-dispositive sanctions upon [Appellants] for [their] contemptuous conduct and bad-faith discovery tactics." The trial court's decision to strike the Appellants' pleadings was based on its finding "that all such prior warnings and less-severe sanction[s] have been ineffective" and that Appellants "have repeatedly and continuously shown a brazen disrespect for the authority and orders of [the] Court, and have willfully and knowingly violated [the] Court's orders, in an attempt to hide, destroy, or conceal evidence relevant to this case and to frustrate the discovery process, to the detriment of [Macris]." The trial court also found that the contemptuous

conduct was likely to continue and would "undermine and erode the public confidence in [the trial] Court and the judicial system in its entirety, as well as severely prejudice [Macris]." Based on this careful assessment of the severity of the conduct and the inability to correct it with less draconian means, the trial court ruled that "dispositive sanctions against [Appellants] are warranted, in the form of striking [their] pleadings, with default judgment to be entered against them."

¶31    The record reflects that the trial court was well within its authority to strike Appellants' pleadings and enter default judgment against them. *See Chen v. Stewart*, 2005 UT 68, ¶ 43, 123 P.3d 416 ("[A] court has the inherent authority to strike a party's pleadings and enter a default judgment if the party engages in conduct designed to improperly influence the court's decision on the merits of the case, such as perjury or obstruction of justice, or if the conduct itself tends to demonstrate bad faith or a lack of merit."). As a result, Appellants are deemed to have admitted the well-pleaded facts of Macris's amended complaint. *See Skanchy v. Calcados Ortope SA*, 952 P.2d 1071, 1076 (Utah 1998) ("Only well-pled facts alleged in the pleadings of the nondefaulting party are binding and can support the default judgment.").[6]

---

6. Our determination that the trial court did not exceed its discretion in entering default judgment against Appellants renders moot their claims that the trial court abused its discretion in granting Macris's motion for a preliminary injunction and in denying their motion for a stay pending resolution of the Federal Lawsuit. *See Burkett v. Schwendiman*, 773 P.2d 42, 44 (Utah 1989) (mem.) ("A case is deemed moot when the requested judicial relief cannot affect the rights of the litigants."); *see also Waterford Tower Condominium Ass'n v. TransAmerica Real Estate Grp.*, 2006-Ohio-508U, ¶ 35 (Ohio Ct. App.) ("Because we affirm the trial court's denial of [appellant's] motion for relief from judgment and allow the trial court's default judgment to stand, we find [appellee's] assignment of error is moot . . . ."); *cf. Schoney v.*
(continued...)

B.      Derivative Claims

¶32    Appellants additionally argue that the trial court erred by entering default judgment on the derivative claims because Macris's amended verified complaint fails to allege that he made a demand on Sevea as required by rule 23A of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 23A(a)(4)–(5) (requiring the shareholder to set forth in the complaint the efforts to obtain the desired action from the company or the reasons for failing to make that effort). "A shareholder may not commence a derivative proceeding until . . . a written demand has been made upon the corporation to take suitable action . . . ." Utah Code Ann. § 16-10a-740(3)(a)(i) (LexisNexis Supp. 2012). A complaint asserting a derivative claim must "either expressly allege that demand was made on the [company] or plead with particularity why such demand would be futile." *GLFP, Ltd. v. CL Mgmt., Ltd.*, 2007 UT App 131, ¶ 29, 163 P.3d 636. In order for "that exception to be satisfied, the circumstances [must be] such that such a demand would be futile and unavailing." *Dansie v. City of Herriman*, 2006 UT 23, ¶ 24, 134 P.3d 1139 (alteration in original) (citation and internal quotation marks omitted) (referring to the exception under rule 23A and under the analogous provision of the Utah Revised Nonprofit Corporation Act). "Therefore, we must examine first whether [Macris] did allege with particularity why demand would be futile and whether that allegation establishes that demand would have been futile and unavailing." *See id*.

---

6. (...continued)
*Memorial Estates, Inc.*, 790 P.2d 584, 587 (Utah Ct. App. 1990) ("Because the court's entry of default judgment is fully supported as indicated by the foregoing analysis, and entry of the default judgment was sufficient, by itself, to dispose of the case, we need not address the issue of whether the entry of summary judgment was also proper in this case.").

¶33   Here, Macris's amended verified complaint states, "It is, and will be, impossible to obtain any action by Sevea to redress the wrongs by the defendants herein for the reason that Sevea is equally controlled by plaintiff Macris and defendant Jerry Saxton who, in significant part, committed the wrongful acts below alleged." The amended verified complaint further alleges that the Voting Agreement "vest[s] corporate shareholder power in a 'Committee', the only members of which were plaintiff Macris and defendant Jerry Saxton," but does not address how to resolve a deadlock between them. The amended verified complaint then describes in detail Jerry Saxton's unilateral decisions to cease Sevea's operations; to remove its "inventory, sales materials, accounting books and records, [d]istributor files, customer files, and equipment"; to terminate and rehire Sevea's employees to work for a competing business; to use a deceptively similar name and the same telephone number for the competing business; and to contact Sevea's distributors and inform them that "'[n]ail production will continue under a new company.'"

¶34   The amended verified complaint establishes that Macris needed Jerry Saxton's approval before Sevea could pursue the derivative claims directly. However, the claims were based on allegations of wrongdoing against Jerry Saxton. Under these circumstances, we agree with the trial court that "Macris has alleged facts which . . . would qualify him for the 'futility exception' to the requirement that demand be made before a shareholder can initiate a derivative action."

## II. Damages

¶35   Appellants next assert that none of the actual damages awarded to Macris are supported by the evidence. They also contend that the damages on the derivative claims must be awarded to Sevea, not to Macris. Additionally, Appellants argue that the punitive damages award is excessive. "It is well settled that, although the plaintiff has the burden of proving the fact,

causation, and amount of damages, he need only do so with reasonable certainty rather than with absolute precision." *Alta Health Strategies, Inc. v. CCI Mech. Serv.*, 930 P.2d 280, 286 (Utah Ct. App. 1996) (citation and internal quotation marks omitted). "[A]lthough damages may not be determined by speculation or guesswork, evidence allowing a just and reasonable estimate of the damages based on relevant data is sufficient." *Id.* (alteration in original) (citation and internal quotation marks omitted).

A.     Derivative Claims

¶36     First, Appellants contend that "Macris provided no evidence that [Appellants'] actions caused a *decrease* in the value of [Sevea]." According to Appellants, "[t]he value of [a] business as [of] a certain date is not an appropriate measure of damages for a derivative claim for breach of fiduciary duty, conversion, or interference with contractual relations." While we agree that the damage to a corporation can be proved by comparing its value before and after the wrongful conduct and showing a decrease, that is not how Appellants' expert calculated damages here. *See Arndt v. First Interstate Bank of Utah, NA*, 1999 UT 91, ¶ 22, 991 P.2d 584 (noting that a claim was derivative because it sought damages for the decreased value of the partnerships); *Stocks v. United States Fid. & Guar. Co.*, 2000 UT App 139, ¶ 16, 3 P.3d 722 (same). Macris's expert, Christopher Howard, and Appellants' expert, Richard Hoffman, offered different theories concerning the proper measure of damages for the derivative claims. Howard used various models and assumptions to calculate the value of Sevea, assuming hypothetically that its assets and employees had not been wrongfully converted and that the business enjoyed significant increases in sales. Based on these projections, he concluded that the losses to Sevea caused by Appellants' breaches of fiduciary duty, conversion, and interference with contractual relations was $5,926,000. Hoffman disagreed with those projections and opined that, even if Appellants had not removed Sevea's equipment, employees, and customers, the company could not have continued

in business because its liabilities greatly exceeded its assets. Therefore, Hoffman concluded that the damages to Sevea could be measured by its liquidation value, which he calculated as $227,712.

¶37   The trial court was not persuaded by Macris's expert because his opinions "fundamentally lack basis, are not based on conventional methods of assessing damages and are inconsistent with the standards applicable to the valuation of such an interest." The trial court further determined, "Howard's projections concerning the level of growth and profitability are simply inaccurate and inconsistent with Sevea's actual economic reality." Instead, the trial court agreed with Hoffman and found that "the value of Sevea as of December 31, 2006, was $227,712." While the trial court does not expressly discuss the components of that valuation in its decision, Hoffman explained that his damage calculation was based on his conclusion that Sevea was essentially bankrupt before Appellants looted its assets and that it would have been forced to liquidate even in the absence of Appellants' wrongful conduct. By adopting Hoffman's valuation figure, the trial court also implicitly adopted his assumption that the proper measure of the damages caused to Sevea by Appellants' breaches of fiduciary duty, conversion, and interference with contractual relationships is the amount Sevea could have received for its assets upon liquidation in December 2006. We are not convinced that the trial court exceeded its discretion by adopting the damage theory advanced by Appellants.

¶38   After adopting Appellants' damage figure, the trial court awarded half of that amount, $113,856, to Macris. Appellants argue that, even if damage to Sevea had been proved, the trial court erred in awarding those damages to Macris individually based on the derivative claims. We agree.

¶39   In *Richardson v. Arizona Fuels Corp.*, 614 P.2d 636 (Utah 1980), the Utah Supreme Court explained that "any compensatory damages which may be recovered on account of any breach by defendants of their fiduciary duty as directors and officers or

arising as a result of mismanagement of the corporation by defendants *belong to the corporation and not to the stockholders individually.*" *Id.* at 640 (emphasis added); *see also Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 31, 216 P.3d 944 ("[T]he damages that the individual [defendants] would pay as a result of the derivative action would be paid out to all [company] shareholders in the winding up after dissolution . . . .").

¶40 Accordingly, if an action is brought as a derivative claim, any recovery belongs to the corporation. *See, e.g., Ross v. Bernhard*, 396 U.S. 531, 538 (1970) ("The proceeds of the [derivative] action belong to the corporation . . . ."); *Rothenberg v. Security Mgmt. Co.*, 667 F.2d 958, 960 n.3 (11th Cir. 1982) ("A shareholder receives no direct benefit from a derivative suit; any recovery belongs to the corporation."). This is because the shareholder is entitled to his pro rata benefit based on stock ownership only after the recovery is subject "to the claims of the corporation's creditors and to the corporate tax consequences." John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Corp. L. 147, 150 (1984) (citation omitted); *see also* Peter H. Donaldson, *Breathing Life Into* Aurora Credit Services, Inc. v. Liberty West Development, Inc.*: Utah's Close Corporation Exception to the Derivative Lawsuit Requirement and the Case for Strong Fiduciary Duties in Close Corporations*, 2002 Utah L. Rev. 519, 523 (2002) ("[W]ith very few exceptions, recovery in a derivative action belongs to the corporation, and like any other corporate asset is subject to preexisting creditor and tax claims, whereas an individual recovery will go directly to the shareholder and will *not* be subject to the claims of corporate creditors.").

¶41 Here, Macris's amended verified complaint asserts derivative claims. Indeed, the amended verified complaint alleges that "Macris, on behalf of Sevea, is entitled to the imposition of a constructive trust created for the benefit of the remaining shareholders and to the exclusion of the Saxtons, with said trust holding all the assets of Sevea." Despite Macris's request for the

creation of a constructive trust, the trial court's December 4, 2009 memorandum decision determined that "the value of Sevea as of December 31, 2006, was $227,712" and that Macris was individually "entitled to one-half of this amount," $113,856, for both or either Macris's and Macris Enterprises's business interest losses. Thereafter, when the trial court entered its final judgment on April 1, 2011, it ordered "[t]hat judgment be entered in favor of [Macris] in the amount of $113,856 against [Appellants], jointly and severally, as a result of default being entered against them on [Macris's] breaches of fiduciary duties, conspiracy to breach fiduciary duties, conversion, and interference with contractual relations causes of action." These claims are classically derivative. *See generally Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1280–81 (Utah 1998). Accordingly, the trial court erred by awarding damages directly to Macris rather than to Sevea on behalf of all of its shareholders and creditors. We therefore vacate the award of damages to Macris on the derivative claims and remand for the trial court to award the damages for those claims to Sevea for appropriate distribution by the custodian.

## B. Malicious Prosecution

¶42 Next, we consider Appellants' challenge to the trial court's award of damages in favor of Macris in the amount of $10,000 against the Saxtons, jointly and severally, for malicious prosecution. Macris testified that as a result of the Saxtons' false statements to the police, he was charged with electronic communications harassment and that, as a direct result, he incurred legal fees and travel expenses for numerous criminal court appearances.[7] Although Macris calculated his damages at $100,000, the trial court concluded that this request did "not represent a reasonable estimate of [Macris's] loss." Instead, after "taking into account the various expenses incurred by . . . Macris, as well as his

---

7. The criminal case was subsequently dismissed for lack of evidence.

lost time and effort," the trial court determined that an award of $10,000 in damages was appropriate. Appellants have not demonstrated that the trial court exceeded its discretion in so concluding.

C.    Slander Per Se

¶43    Appellants also claim that the trial court exceeded its discretion in awarding $100,000 in damages against Jerry Saxton for slander, arguing that Macris failed to provide evidence of his damages. Although Macris was unable to quantify his specific damages, the trial court awarded him $100,000 in general damages based on its conclusion that the false statements constituted slander per se.

> In order to constitute slander per se, without a showing of special harm, it is necessary that the defamatory words fall into one of four categories: (1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office[,] and (4) charge of the unchastity of a woman.

*Allred v. Cook*, 590 P.2d 318, 320 (Utah 1979). Here, Macris provided unrefuted testimony that Jerry Saxton told numerous individuals that Macris had embezzled Sevea's funds and that Jerry Saxton made statements to Sevea's employees that Macris was a thief and had stolen from Jerry Saxton, that Macris has "connections" and can "bump people off" and "leave a body in the desert to die," that Macris had a drug problem and a criminal history, and that Macris was a violent person. We agree with the trial court that these statements constitute slander per se because they allege that Macris was involved in criminal activity and conduct incompatible with the exercise of a lawful business, trade, profession, or office. *See id.*

¶44    Unlike ordinary slander, "[s]lander per se does not require a showing of special damages because damages and malice are implied." *See id.* at 321. Thus, the trial court was justified in awarding general damages for the loss of reputation, shame, or emotional impact suffered by Macris. "[G]eneral damages are those which, from the common sense and experience of mankind, would naturally be expected to result from that type of a wrong to any person so injured." *Prince v. Peterson*, 538 P.2d 1325, 1328 (Utah 1975). As to the amount of the damages awarded, this court "will not overturn the trial court's decision unless there was no reasonable basis for the decision." *Richards v. Brown*, 2009 UT App 315, ¶ 12, 222 P.3d 69.

¶45    Macris testified that as a result of Jerry Saxton's slanderous statements, "[he] didn't sleep, [he] didn't eat," his business was negatively impacted, and he lost "some personal and some business relationships." The trial court found Macris's testimony regarding Jerry Saxton's false statements and their negative impact on Macris to be credible. Accordingly, there was a reasonable basis for the trial court's award of $100,000 in general damages for slander per se, and we decline to overturn it.

D.    Punitive Damages

¶46    Last, Appellants contend that the punitive damages award of $1,119,280 was excessive, not supported by the evidence, and at odds with the factors outlined in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), *holding modified by Westgate Resorts, Ltd. v. Consumer Protection Group, LLC*, 2012 UT 55, 285 P.3d 1219. In *Crookston*, the Utah Supreme Court articulated certain factors that a court should use to assess punitive damages, including

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the

effect thereof on the lives of the plaintiff and others;[8] (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

*Id.* at 808.

¶47 In assessing whether those factors have been correctly applied, our supreme court has further explained that "where the punitives are well below $100,000, punitive damage awards beyond a 3 to 1 ratio to actual damages have seldom been upheld and that where the award is in excess of $100,000, we have indicated some inclination to overturn awards having ratios of less than 3 to 1." *Id.* at 810. When a punitive damages award "exceeds the ratios set by our past pattern of decision," the supreme court has instructed that "the trial judge must make a detailed and reasoned articulation of the grounds for concluding that the award is not excessive in light of the law and the facts." *Id.* at 811. In doing so, the trial judge should consider the seven *Crookston* factors, "unless some other factor seems compelling to the trial court." *Id.* The trial judge may

> explain why the large ratio of punitives to actuals is necessary in the context of the particular case in order to further the purposes of punitive damages by punishing and deterring outrageous and malicious conduct [or conduct which manifests a knowing or reckless indifference toward, and disregard of, the rights of others] which is not likely to be deterred by other means. In sum, the trial judge's articulation

---

8. The Utah Supreme Court clarified in *Westgate Resorts, Ltd. v. Consumer Protection Group, LLC*, 2012 UT 55, 285 P.3d 1219, that this fourth "'harm to others' [factor] may only be used to assess reprehensibility, but may not be used to directly punish a defendant for harm caused to nonparties." *Id*. ¶ 14.

should explain why the award is not excessive despite the fact that it exceeds the general pattern of awards upheld in our prior cases.

*Id*. (alteration in original) (citations and internal quotation marks omitted).

¶48     In the present case, the trial court explained its decision to award punitive damages, stating, "[Appellants'] misconduct has been ongoing, egregious and reprehensible." It further noted that Appellants "have impacted . . . Macris's life on both personal and professional levels in a multitude of ways" and "have ignored [the] Court's Orders and have acted with absolute impunity to [the] Court's directions, consistently acting in ways to hinder this process in furtherance of their own self-interests." In addition, the trial court "expressly [found] that there is an undoubted probability of future recurrence of their misconduct" and that Macris had "presented clear evidence of . . . [Appellants'] relative wealth," while "the Saxtons did not appear at the trial and did not present any evidence of their inability to pay a large award of punitive damages." Because "the Saxtons abused their relationship with [Macris] and took advantage of him to further their economic interests," the trial court awarded punitive damages in the amount of $1,119,280.

¶49     Appellants first argue that the trial court's failure to make a specific finding as to the Saxtons' wealth prevented a reasoned analysis of the first *Crookston* factor. However, this court has previously recognized that "[a]lthough relative wealth is a factor to be considered, . . . the introduction of evidence as to the relative wealth of the defendant is not a technical prerequisite to an award of punitive damages." *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 20, 243 P.3d 508 (citation and internal quotation marks omitted). "Furthermore, [defendants] may not simply remain secretive regarding their incomes and assets in an attempt to thwart the assessment of a punitive damages award . . . ." *Id*. Jerry

Saxton chose not to appear at the damages hearing. In his absence, Macris gave unchallenged testimony that Jerry Saxton's net worth was in excess of $10 million, that Jerry Saxton claimed that he had the ability to earn $200,000 per month "in [his] sleep," that the Saxtons had listed their Salt Lake City home for just under $2 million, and that the home contained $400,000 to $500,000 worth of furnishings. Furthermore, Macris testified that Jerry Saxton owned multiple homes, planes, and businesses. Accordingly, the trial court adequately considered the first *Crookston* factor.

¶50    Appellants next contend that punitive damages can be awarded only to punish the party for the outrageousness of the conduct establishing liability for the claims asserted and not as a sanction for discovery abuses or contempt. However, that position was rejected by the Utah Supreme Court in *Diversified Holdings, LC v. Turner*, 2002 UT 129, 63 P.3d 686. There, the supreme court explained,

> Behaviors that undermine the efficiency and integrity of the judicial process may also be considered under the rubric of the second *Crookston* [] factor[, i.e., the nature of the alleged misconduct]; in *Campbell* [*v. State Farm Mutual Automobile Insurance Co.*, 2001 UT 89, 65 P.3d 1134, *rev'd on other grounds*, 538 U.S. 408 (2003),] we singled out for censure the defendant's systematic destruction of documents related to its challenged activities and its policy of harassing and exhausting legal opponents.

*Id*. ¶ 17 (citing *Campbell*, 2001 UT 89, ¶¶ 30–31). While the trial court was free to consider that it had already imposed various sanctions on Appellants throughout the proceedings—including fines, jail time, attorney fees, striking their pleadings, and entering default judgment against them—it could also consider the nature of Appellants' contemptuous conduct in determining the appropriate amount of punitive damages. Thus, we affirm the trial

court's determination that an award of punitive damages is warranted.

¶51     Appellants also contend that there is an insufficient basis to justify a punitive damage award with a ratio of 5 to 1. Because the trial court did not "explain why the large ratio of punitives to actuals is necessary in the context of [this] particular case," we agree. *See Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 811 (Utah 1991), *holding modified by Westgate Resorts, Ltd. v. Consumer Prot. Grp., LLC*, 2012 UT 55, 285 P.3d 1219. The punitive damages award here is outside the range traditionally upheld in Utah because it greatly exceeds $100,000 and is significantly more than three times the amount of the actual damages awarded. While the trial court generally discussed the *Crookston* factors in determining that punitive damages should be awarded, it did not address the propriety of the 5 to 1 ratio of the $1,119,280 in the amount of punitive damages awarded to the $223,856 in actual damages. *See id.* at 808, 810–11. While a ratio exceeding 3 to 1 for awards greater than $100,000 may be upheld based on appropriate facts, *see Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶¶ 47–48, 82 P.3d 1064 (upholding a punitive damage award with a ratio of 5.5 to 1 where "the evidence in the record and [the Utah Supreme Court's] overall analysis support[ed] an award of this amount as a serious reprimand for [defendant's] actions to deter future misconduct"), it comes with a presumption of excessiveness, *see Diversified Holdings*, 2002 UT 129, ¶ 24 ("[A]n award that falls outside certain parameters will . . . elicit more searching judicial scrutiny.").

¶52     Thus, while we affirm the trial court's conclusion that Appellants' conduct was outrageous and offensive, thereby justifying an award of punitive damages, we remand to the trial court for an explanation of the unusually high ratio of the amount of punitive damages to the amount of actual damages. *See Crookston*, 817 P.2d at 813 ("[W]e plainly fix the primary responsibility of reviewing the amount of punitive damage awards on the court best equipped to perform such a review—the trial

court."). In doing so, the trial court should first recalculate the amount of actual damages in accordance with this decision. It should then determine the appropriate amount of punitive damages. If the punitive damages remain greater than $100,000 and more than three times the actual damages, the trial court should provide an explanation of why exceeding the traditional limits on such awards is warranted under the facts of this case.

## III. Attorney Fees on Appeal

¶53    Macris argues that he is entitled to an award of attorney fees incurred on appeal. "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (citation and internal quotation marks omitted). We therefore award Macris partial attorney fees on appeal. Because Macris prevailed only in part on appeal, we remand to the trial court for a determination of the appropriate amount of attorney fees and costs incurred with respect to the issues on which he was successful on the appeal.

## CONCLUSION

¶54    The trial court acted within its discretion in striking Appellants' pleadings and entering default judgment against them. The trial court did not exceed its discretion in calculating the amount of damages on Macris's derivative claims, but it did err in awarding those damages to Macris individually rather than to Sevea. Therefore, we remand to the trial court with instructions to award the damages for the derivative claims to Sevea for appropriate distribution by the custodian. The trial court did not exceed its discretion in awarding compensatory damages for malicious prosecution and slander per se. Last, the trial court's award of punitive damages is presumptively excessive and the trial court has provided no explanation for why a greater ratio of

punitive damages to actual damages is justified here. We therefore remand to the trial court for reconsideration of the punitive damage award in light of the final amount of actual damages awarded to Macris after remand and the guidance provided in this opinion. Macris is entitled to attorney fees reasonably incurred on appeal for the issues on which he was successful, and we remand to the trial court for a determination of that amount.

———————