2012 UT 55

**WESTGATE RESORTS, Ltd., Plaintiff, Counterdefendant, and Appellant,**

v.

**Shaun S. Adel and CONSUMER PROTECTION GROUP, LLC, Defendants, Counterclaimant, and APPELLEE.**

No. 20100425.

Supreme Court of Utah.

Sept. 7, 2012.

Michael D. Zimmerman, Troy L. Booher, Christopher L. Stout, Salt Lake City, Richard W. Epstein, Ft. Lauderdale, FL, for appellant.

L. Rich Humpherys, Karra J. Porter, Scot A. Boyd, Salt Lake City, for appellee.

Associate Chief Justice NEHRING, opinion of the Court:

¶ 1 In this appeal we review and hold to be unconstitutional a jury's award of punitive damages. Westgate Resorts contends that the punitive damages awarded to Consumer Protection Group violate both substantive and procedural due process. We agree with Westgate that the award violates procedural due process. In light of this conclusion, we need not reach Westgate's argument that the award was unconstitutionally excessive in violation of substantive due process. We vacate the jury's punitive damages award and remand for a new trial on the punitive damages issue only.

## BACKGROUND

¶ 2 Westgate Resorts is a large real estate timeshare company. In 2007, Westgate grossed over one billion dollars in revenue and had approximately 400,000 owners of fractional interests in properties worldwide. In October 2000, Westgate began selling timeshares for its "Westgate at the Canyons" resort in Park City, Utah. To market its new resort, Westgate offered a certificate for a three-day, two-night vacation to Anaheim, California to consumers who were willing to travel to Park City and endure a ninety-minute presentation about the company. Westgate represented to its consumers that the certificate was worth approximately $500. The certificates turned out to be almost impossible to redeem.

¶ 3 The obstacles that confronted consumers who sought to redeem their certificates were both numerous and daunting. The terms and conditions included a $135 deposit,

date restrictions, cancellation penalties, and the package was subject to change without notice. Upon reading these restrictions, at least two of the consumers decided that it was "just not worth it" to even try to redeem the certificate. Others contacted the unhelpful redemption company, discovered how difficult it would be to redeem the certificate, and then gave up. Those who did try to follow through with redeeming their certificates experienced many problems and had to call the redemption center numerous times. After paying the $135 deposit, consumers could request three dates when they would like to redeem their vacation package, and then wait to hear from the redemption center if any of their chosen dates were deemed "valid." Over and over again, the consumers were told that their requested dates were unavailable. Only one consumer was ever able to redeem his certificate and travel to Anaheim, but even this was only because the agent that had continually denied his requested dates took maternity leave and the temporary agent approved and booked the trip.

¶ 4 Shaun Adel, a disgruntled former employee of Westgate, formed Consumer Protection Group (CPG) to right these perceived wrongs. CPG contacted people who had received the Anaheim certificates and solicited them to assign their claims to CPG. CPG promised the consumers it would share any recovery with them. CPG accumulated 500 claims.

¶ 5 Westgate sued Mr. Adel, claiming intentional interference with existing and potential economic relations, conversion, breach of contract, and violation of the Utah Uniform Trade Secrets Act. Westgate asked for injunctive relief to prevent Mr. Adel from contacting any other Westgate consumers. In response, Mr. Adel and CPG counterclaimed on behalf of the 500 claimants. CPG alleged, among other things, breach of contract, fraudulent inducement, and violation of the Utah Consumer Protection Act.

¶ 6 Seven years and many pleadings later, fifteen of CPG's consumer claims were consolidated and tried together. During the trial, CPG occasionally reminded the jury of the many Westgate consumers who suffered the same fate as the plaintiffs, but were not parties to the lawsuit. These comments were stricken by the trial court. But during closing argument, CPG again invoked other potential plaintiffs and offered the jury a sample calculation of punitive damages that relied on the harm done to the nonparty consumers.

¶ 7 The jury awarded actual economic damages of between $5 and $550 for each claimant, for a total of $7,242, and declined to award any actual damages for emotional distress. The jury also awarded each claimant punitive damages of $66,666.67, for a total of $1,000,000.

¶ 8 After the jury rendered its verdict, Westgate moved for judgment as a matter of law, for a new trial, and for a remittitur. The trial court addressed these motions together and denied them all. Westgate appealed. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j).

## ISSUES AND STANDARDS OF REVIEW

¶ 9 We review de novo the constitutionality of a punitive damages award.[1] We then consider Westgate's argument that the trial court erred when it consolidated CPG's claims. We review a trial court's decision to consolidate for the abuse of discretion.[2] We next consider CPG's claim, on cross-appeal, that the trial court erred when it determined that CPG lacked standing to bring claims under the Utah Consumer Sales Practices Act, Utah Code section 13–11–4.[3] We review the trial court's interpretation of a statute for correctness.[4] Finally, we grant CPG's re-

---

1. See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 431, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); see also Smith v. Fairfax Realty, Inc., 2003 UT 41, ¶ 31 & n. 13, 82 P.3d 1064.

2. See Raggenbuck v. Suhrmann, 7 Utah 2d 327, 325 P.2d 258, 259 (1958).

3. UTAH CODE § 13–11–4.

4. See State v. Parduhn, 2011 UT 57, ¶ 16, 266 P.3d 765.

quest to instruct the trial court to revisit CPG's argument that it is entitled to attorney fees under the private attorney general doctrine.

## ANALYSIS

### I. PUNITIVE DAMAGES

¶ 10 "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."[5] But to ensure that awards are not arbitrary and do not encroach on the sovereignty of neighboring states, the U.S. Supreme Court has determined "that the Constitution imposes certain limits, in respect both to procedures for awarding punitive damages and to amounts forbidden as grossly excessive."[6] At issue in this case is the Constitution's Due Process Clause, which, as explained by the Supreme Court in *Philip Morris USA v. Williams*,[7] "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties."[8]

¶ 11 There are three reasons for the *Philip Morris* prohibition. First, "the Due Process Clause prohibits a State from punishing an individual without first providing that individual with an opportunity to present every available defense. Yet a defendant threatened with punishment for injuring a nonparty victim has no opportunity to defend against the charge."[9] Second, "to permit punishment for injuring a nonparty victim would add a near standardless dimension to the punitive damages equation."[10] In explaining this concern, the Supreme Court posed theoretical questions ("How many such victims are there? How seriously were they injured? Under what circumstances did injury occur?") and surmised that "[t]he trial will not likely answer such questions," but, rather, "[t]he jury will be left to speculate."[11] Such speculation would risk that "the fundamental due process concerns ... of arbitrariness, uncertainty, and lack of notice [ ] will be magnified."[12] Third, there is "no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others."[13] The Supreme Court clarified that its prior case law established that "it may be appropriate to consider the reasonableness of a punitive damages award in light of the *potential* harm the defendant's conduct could have caused [if] the potential harm at issue was harm potentially caused *the plaintiff.*"[14]

¶ 12 Thus, *Philip Morris* clarifies that "a plaintiff may show harm to others in order to demonstrate reprehensibility."[15] This is because "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible."[16] But "a jury may not ... use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties."[17]

¶ 13 This relatively recent direction from the U.S. Supreme Court forces us to redefine our long-standing rules on punitive damages. For over twenty years, Utah courts have relied on factors articulated in *Crookston v. Fire Insurance Exchange*[18] to assess punitive damages. Those factors are:

---

5. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

6. *Philip Morris USA v. Williams,* 549 U.S. 346, 353, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (internal quotation marks omitted).

7. *Id.*

8. *Id.*

9. *Id.* (internal quotation marks omitted).

10. *Id.* at 354, 127 S.Ct. 1057.

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.* at 355, 127 S.Ct. 1057.

16. *Id.*

17. *Id.*

18. 817 P.2d 789 (Utah 1991).

(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.[19]

¶ 14 *Philip Morris* compels us to reformulate the fourth *Crookston* factor: "the effect [of the defendant's misconduct] on the lives of ... others." For brevity, we will refer to this as the "harm to others" factor. We adopt the guidance of *Philip Morris* and clarify that "harm to others" may only be used to assess reprehensibility, but may not be used to directly punish a defendant for harm caused to nonparties. But, as the Supreme Court conceded, this is an aspirational statement that presents a problem in practice. To aid state courts in the implementation of *Philip Morris*, the Court offered this:

> How can we know whether a jury, in taking account of harm caused others under the rubric of reprehensibility, also seeks to *punish* the defendant for having caused injury to others? Our answer is that state courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring. In particular, we believe that where the risk of that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, upon request, must protect against that risk. Although the States have some flexibility to determine what *kind* of procedures they will implement, federal constitutional law obligates them to provide *some* form of protection in appropriate cases.[20]

¶ 15 Westgate argues that the trial court did not protect against the risk that the jury might improperly consider harm to others.[21] Westgate objects to statements made by CPG's attorney during closing argument.

Westgate contends that counsel's statements went beyond the jury instructions, violated *Philip Morris*, and seduced the jury into inappropriately considering "harm to others."

¶ 16 During closing argument, CPG's counsel explicitly encouraged the jury to punish Westgate for the harm it caused to all 500 claimants. We quote liberally from the record:

> [I]f we're saying, well, we're just going to punish Westgate for these fifteen people, then we are not doing the purpose and fulfilling the purpose of punitive damages.
>
> So we're kind of caught in that sticky thing that we have fifteen verdicts, so what do we do and how do we address punishing Westgate for the entire scheme, trying to have an amount that would deter or dissuade them from ever engaging in this kind of conduct again, and then we do it among 15. But we need to do that, so I'm going to suggest a way that I think would be fair so that we don't have duplication and yet we fulfill the purpose of punitive damages....
>
> The promised gift was $500. We have ... somewhere between 2400 and 3700 [potential consumers] that used this certificate. If you take just the cost or what was promised as the value times 3,000, which is about in the middle of that range, that equals about $1.5 million.
>
> Now, as I talk about that, we need to appreciate all that does is get us to restitution. Five hundred dollars that should have been paid from the beginning is an amount of 1.5 [million dollars]. That doesn't even talk about punishment, it doesn't talk about deterrence.
>
> So what amount in a large corporation such as this is it going to take to make sure that this company doesn't engage in this kind of fraudulent behavior ever again? ...
>
> So what I would suggest to you is this: A company such as Westgate needs to feel some type of financial pain, since a corpo-

---

19. *Id.* at 808.

20. *Philip Morris*, 549 U.S. at 357, 127 S.Ct. 1057 (emphases in original).

21. Westgate does not challenge the jury instruction given, which Westgate agrees appropriately explained the law, even in light of *Philip Morris*.

ration feels no pain otherwise, in order to make sure it knows that in Utah we will not accept this kind of fraudulent scheme and don't come into Utah ever again with this kind of approach, and if all we're doing is making them pay the $500 that they promised to pay, that's not paying. That's what they agreed to pay already. It has to be something higher than that. . . .

Can you see the purpose and wisdom of having punitive damages awarded? Because it is in our legal system nearly impossible to try and litigate the entire matter or we'd be here for years, and so that is the primary purpose of punitive damage is to make sure that on a one time basis we can address this as a whole.

¶ 17 At this point, Westgate objected and moved to strike the entire statement. The trial court allowed it and repeated the *Crookston* factors. The parties and trial judge engaged in this colloquy:

Westgate: Objection. I move to strike that entire last dialogue. I think it's entirely improper argument.

Trial Court: You may respond, Counsel.

CPG: Sure. In the Jury Instruction, Your Honor, one of the things that the jury must consider is item Number 4, the effect of the conduct on the lives of the consumers and others. I'm addressing that very thing.

Westgate: The consumers involved in this case, it has nothing to do with that. This is something else that's not before the jury at all.

Trial Court: I do think it's restricted to the consumers that, or the witnesses before this case, is it not, Counsel, the reference?

CPG: . . . For punitive damages, no, Your Honor; for compensatory, yes.

Trial Court: Well, compensatory, clearly, but as it relates to punitive damages, read the generic—whether it's generic or whether it's individualized. We have—some of it's generic.

The probability of future reoccurrence of the misconduct, you have the facts and circumstances surrounding such conduct,

you have the effect of the conduct on the lives of the consumers and others.

CPG: That's right, and others. . . . And that's the point. All punitive damage claims relate to the entirety, and it also goes to the reprehensibility of the conduct.

Trial Court: I'll allow it.

CPG: All right.

Westgate: Just so it's clear so I understand it, I want to make sure I understand for purposes of this record that he's able to argue that punitive damages can be awarded for the entire group of people that might have been affected by this particular premium incentive program; is that right?

Trial Court: He may argue the facts and circumstances surrounding the conduct, the nature of the alleged conduct, the relative wealth of Westgate Resorts, the effect of the conduct on the lives of the consumers and others, the probability of future recurrence and misconduct, the relationship of the parties and the amount of actual damages awarded. As long as he's confined to that, that's the Instruction 76 relative to punitive damages.

CPG's counsel began again. He offered a mathematical equation for calculating a punitive damages award:

Here's what I would suggest is appropriate: If we were to take the $500 per [potential consumer] that was promised and not given, and if you were to take the figure and times three, times all of the people who have been subjected to this fraudulent scheme, I believe that the figure of $4.5 million is an appropriate award for punitive damages, and if you were to divide that into 15, which are the number of verdicts that you have, I believe the math is $300,000 each.

I again emphasize it would be wrong to assume that if we divide it up into 15, which is nothing more than a logistical way to address before you, it is not the basis upon which the award is given to any one person, then it would be wrong to assume otherwise, and I believe that that is what is necessary to catch the attention of the

timeshare company that is using these kinds of tactics and kept using them even after they knew and how fraudulent it was and how little they've done and how little remorse they have shown at all in this particular case. There needs to be a very strong message sent back to corporate headquarters.

¶ 18 Following trial, Westgate moved for a judgment as a matter of law, for a new trial, and for a remittitur. Westgate raised its procedural due process argument in the context of its substantive due process argument. It asserted that "[t]he colossal size of the punitive damage award, unconnected to any harm the consumers actually suffered, also demonstrates that the jury impermissibly considered harm supposedly caused to others." Westgate then argued that *Philip Morris* "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicted upon nonparties or those whom they directly represent, i.e. injury that it inflicts upon those who are, essentially, strangers to the litigation." Westgate quoted CPG's counsel's closing argument and concluded, "Thus, because the jury improperly punished Westgate for conduct unrelated to the specific harm which was the subject of CPG's claims actually being tried, the punitive damages award denied Westgate due process."

¶ 19 In its order denying Westgate's motions, the trial court recognized that Westgate preserved its due process argument. The trial court summarized CPG's argument that the jury was allowed to consider harm to others in determining reprehensibility, and that because counsel for Westgate had stipulated to a jury instruction consistent with that statement, it could not complain that the jury followed the instruction. The trial court then determined that the punitive damages award comported with the constitutional requirements of substantive due process. Addressing a different portion of the trial, the trial court noted that "any references to hundreds or thousands of misled Consumers was struck by this court and was not likely to prejudice the jury considering the weight of all the other evidence against Westgate that

was presented during the two-week trial." But the trial court never specifically addressed its failure to strike such statements during closing argument, nor did it squarely address Westgate's procedural due process argument. It simply stated that there was no evidence that the jury did not consider the *Crookston* factors, and that the ratio of punitive damages to actual damages was appropriate in this case.

■ ¶ 20 On appeal, Westgate contends that CPG's closing argument violated *Philip Morris* because it explicitly invited the jury to consider nonparties in its calculation of punitive damages and did not cabin "harm to others" within the issue of reprehensibility. In particular, Westgate points to CPG's counsel's statement that "the primary purpose of punitive damage is to make sure that on a one time basis we can address this as a whole." In Westgate's view, this statement encapsulates CPG's position that the punitive damage award here should have been used to punish Westgate for all harms caused to nonparties.

¶ 21 CPG responds that it was Westgate's burden to ensure that the mandates of *Philip Morris* were met. In other words, CPG argues that Westgate did not "request" protection—the underlying basis of the Supreme Court's mandate to state courts.[22] CPG asserts that Westgate bears the burden of providing the appropriate instruction, objecting if it thinks the instruction was violated, and asking for a curative instruction. CPG faults Westgate for doing none of these things. CPG points out that Westgate stipulated to Jury Instruction 75, which was a recitation of the *Crookston* factors, and "did not request a '*Philip Morris*' instruction." Further, Westgate objected during closing argument only once, and did not renew its objection when CPG's counsel offered its mathematical equation of multiplying the certificates' cost by an unproven number of potential consumers. Likewise, Westgate never asked for a curative instruction explaining to the jury that it must cabin its consideration of "harm to others" within the question of reprehensibility, and could not punish Westgate for any

**22.** *See id.*

harm it had caused to nonparties. Because Westgate did not bear its burden, CPG argues, Westgate waived its argument, or invited the error.[23]

■ ¶ 22 The Supreme Court's *Philip Morris* mandate is that "a court, *upon request,* must protect against" the risk of lawfully punishing a defendant for harm caused to nonparties.[24] We hold that, here, an objection lodged with a trial court based on a plaintiff's suggestion that the jury calculate punitive damages by assessing the damage caused to nonparties suffices to serve as a "request" under *Philip Morris.* It is not necessary that a defendant repeatedly renew its objection, or ask for a curative instruction after the trial court has denied its motion to strike. Here, Westgate objected, stated the grounds for its objection, and the trial court overruled it. We conclude that this objection triggered the trial court's obligation to protect Westgate against the risk that the jury would calculate punitive damages by assessing the damage caused to nonparties. And we conclude that, in this case, the trial court did not adequately protect Westgate from the risk that CPG's closing arguments unlawfully invited the jury to punish Westgate for harm caused to nonparty victims. We therefore remand this case so that the punitive damages award may be calculated in a manner consistent with *Philip Morris* and this opinion.

■ ¶ 23 It is appropriate under the circumstances to aid parties and trial courts in their future implementation of the requirements of *Philip Morris* and this case. Jury instructions regarding punitive damages have, to this point, been drawn from *Crookston. Crookston* remains good law, but the "harm to others" factor must be modified to be constitutionally accurate. Jury instructions should now include an explanation that "harm to others" may be considered for reprehensibility only, and not for punishment.

## II. CONSOLIDATION

■ ¶ 24 Westgate also argues that the trial court erred when it permitted consolidation of fifteen claims. Westgate contends that the claims were too disparate to be tried together, and that the consolidation resulted in prejudice to it.

¶ 25 Rule 42(a) of the Utah Rules of Civil Procedure allows a trial court to consolidate "actions involving a common question of law or fact." "The authority to consolidate actions for trial is provided by the rules in the interests of efficient judicial administration. As is true of any other kind of judicial discretion, it is subject to abuse...."[25] It is thus appropriate for us to remand for separate trials if an error in the interpretation and application of the consolidation rule results in substantial prejudice to a defendant.

¶ 26 Westgate argues that it was prejudiced by the consolidation. It contends that "[b]ecause the claims were disparate and the trial court did not insist on steps being taken to ensure scrupulous fairness and to minimize prejudice, the jury was permitted to hear inadmissible evidence and to punish Westgate for harms suffered by third parties and nonparties." Westgate argues that the consolidation "heightened the prejudice and ... led to violations of Westgate's procedural due process rights." Westgate then complains that the jury was allowed to hear references to nonparties allegedly harmed by Westgate's conduct.

¶ 27 Westgate offers no evidence that it was harmed by the consolidation. Indeed, viewed objectively, the jury seems to have had no difficulty separating the appropriate actual damages for each claimant—awarding a range of economic damages to the various claimants, depending on their individual circumstances. And because the jury is allowed to hear evidence of "harm to others" when considering reprehensibility, we cannot say with confidence that Westgate was preju-

23. *See State v. Winfield,* 2006 UT 4, ¶ 14, 128 P.3d 1171.

24. *Philip Morris,* 549 U.S. at 357, 127 S.Ct. 1057 (emphasis added).

25. *Lignell v. Berg,* 593 P.2d 800, 806 (Utah 1979).

diced by the jury considering all fifteen cases.[26]

¶ 28 We therefore conclude that the trial court did not abuse its discretion in consolidating the fifteen claims.

## III. ASSIGNABILITY (Cross–Appeal)

¶ 29 CPG cross-appeals the trial court's ruling that CPG lacked standing to bring claims under the Utah Consumer Sales Practices Act (UCSPA). That Act authorizes a "consumer" to bring a claim for "[a] deceptive act or practice by a supplier in connection with a consumer transaction."[27] Further, "[a] consumer who suffers loss as a result of a violation of [the UCSPA] may recover ... actual damages or $2,000, whichever is greater, plus court costs."[28]

¶ 30 The trial court determined that CPG was not a consumer, but, rather, an assignee of consumer claims. The trial court therefore concluded that CPG lacked standing to bring claims under the UCSPA.

■ ¶ 31 On appeal, CPG argues that UCSPA claims are assignable, and that when CPG obtained the UCSPA claims of individual consumers, it effectively stepped into their shoes and obtained standing to bring UCSPA claims. This is a question of first impression.

¶ 32 Given its nature, a UCSPA claim is essentially a claim for statutory fraud. For guidance on whether statutory claims of fraud are assignable, we turn to our limited case law on assignability of fraud claims.

¶ 33 In *Mayer v. Rankin*,[29] this court determined that "an action for the recovery of

money secured by fraud [was] assignable."[30] In that case, the plaintiff brought a claim against the defendant for fraud alleging that the defendant "devised a scheme to defraud the plaintiff's assignors ... by selling them stock ... at false and fictitious values."[31] Relying on the defendant's misrepresentations, the plaintiff's assignors purchased the stocks at artificially high prices, providing significant profits for the defendant.[32] The defendant argued that fraud claims were not assignable and the action should be dismissed.[33] The court noted that "[t]he trend of judicial opinion has been to enlarge rather than restrict the causes that may be assigned.... The rule of nonassignability no longer extends to all actions arising [in tort]."[34] The court then held that "[w]hile a mere naked right to recover for fraud is not assignable, ... the weight of authority and ... sound legal principles [persuade us that] an assignment is upheld when it carries with it a subsisting substantial right to property independent of the right to sue for fraud."[35] The court concluded that the cause of action to recover the money paid for the stocks as a result of fraud was assignable.[36]

¶ 34 Our court of appeals followed *Mayer* in *Russell/Packard Development, Inc. v. Carson*.[37] In *Russell/Packard*, the plaintiff's assignor was fraudulently induced to enter a real estate purchase contract in which it agreed to pay a higher price than the property was worth.[38] The defendant profited at the expense of the plaintiff.[39] The court of appeals determined that *Mayer* was indistinguishable from the case before it: "In both cases, the property that the plaintiffs

---

26. As explained in Part I, we agree with Westgate that its procedural due process rights may have been violated by the jury's consideration of harm to nonparties. If this violation was compounded by the consolidation, prejudice may have resulted. Any such prejudice will be cured by our remand for a recalculation of the punitive damages award.

27. UTAH CODE § 13–11–4(1).

28. *Id.* § 13–11–19(2).

29. 91 Utah 193, 63 P.2d 611 (1936).

30. *Id.* at 616.

31. *Id.* at 613.

32. *Id.* at 613–14.

33. *Id.* at 616.

34. *Id.*

35. *Id.* at 616–17.

36. *Id.* at 617.

37. 2003 UT App 316, 78 P.3d 616.

38. *Id.* ¶ 31.

39. *Id.*

[sought] to recover through their fraud claims [was] the money 'had [by the plaintiffs] and received [fraudulently by the defendants.]' " [40] The court of appeals thus determined that the fraud claim was assignable and allowed the assignee to pursue its claims of common-law fraud against the defendant.

 ¶ 35 We conclude that the same reasoning applies here. Where property is sought to be recovered, claims for fraud are assignable. This would not be true where there is a statutory instruction to the contrary. But the UCSPA does not bar assignability. We therefore see no reason that UCSPA claims should not be assignable.

¶ 36 We reverse the trial court's ruling that CPG lacked standing to bring these claims. On remand, CPG is not entitled to double recovery, but it may pursue this claim if it chooses.

## IV. PRIVATE ATTORNEY GENERAL DOCTRINE

¶ 37 Finally, the trial court denied CPG attorney fees under the private attorney general doctrine. The trial court stated:

> Many of the arguments CPG made in favor of the private attorney general doctrine also relate to its plea for this court to uphold the punitive damages award. Thus, the issue does not need to be revisited. The goals of deterrence and punishment are met by the punitive damages award.

Because we reverse and remand for a new punitive damages award, we also instruct the trial court to now revisit the question of whether attorney fees should be awarded under the private attorney general doctrine.

## CONCLUSION

¶ 38 First, the statements made by CPG's counsel during closing argument created a

risk that the jury would improperly consider harm allegedly caused by Westgate to nonparties when it fixed its punitive damages award. Under law established by *Philip Morris USA v. Williams*,[41] this violated Westgate's procedural due process rights. The trial court erred when it did not protect against this risk, and we reverse and remand for a new evaluation of the punitive damages award only.

¶ 39 Second, Westgate has not demonstrated that it was prejudiced by the *consolidation*, although we agree that it may have been prejudiced by the jury's possibly inappropriate consideration of "harm to others." However, this problem will be resolved by our remand for a new punitive damages award. Westgate has not demonstrated that prejudice resulted from the consolidation of the test cases themselves. We therefore conclude that the trial court did not abuse its discretion in consolidating them.

¶ 40 Next, we reverse the trial court's conclusion that CPG lacked standing to bring the claims under the UCSPA. On remand, CPG may pursue this statutory remedy if it so chooses.

¶ 41 Finally, we instruct the trial court to revisit the issue of whether attorney fees should be awarded under the private attorney general doctrine.

Associate Chief Justice NEHRING authored the opinion of the Court, in which Chief Justice DURRANT, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

---

**40.** *Id.* (third and fourth alterations in original) (quoting *Mayer*, 63 P.2d at 616).

**41.** 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007).