**2018 UT App 199**

THE UTAH COURT OF APPEALS

BODELL CONSTRUCTION COMPANY,
Appellee,
*v.*
FIRST INTERSTATE FINANCIAL LLC, FIRST INTERSTATE FINANCIAL
UTAH LLC, FIRST INTERSTATE FINANCIAL LLC, AND
PAUL THURSTON,
Appellants.

Opinion
No. 20160855-CA
Filed October 18, 2018

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 120901496

Karra J. Porter, Kristen C. Kiburtz, and James C.
Lewis, Attorneys for Appellants

Jeffrey L. Silvestrini, Stephen T. Hester, and Bradley
M. Strassberg, Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HAGEN, Judge:

¶1    A jury found that First Interstate Financial LLC, First Interstate Financial Utah LLC, First Interstate Financial LLC, and Paul Thurston (Thurston),[1] defrauded Bodell Construction Company (Bodell) by misrepresenting a real estate investment.

---

1. Because we use "Thurston" interchangeably to refer to both Paul Thurston individually and the appellants collectively, we use singular, masculine pronouns for convenience.

Bodell discovered the misrepresentations after learning that McGillis Investment Company (McGillis) had sued Thurston over the same investment (the McGillis Litigation). The McGillis Litigation is central to each claim of error presented on appeal. First, Thurston challenges the admission of evidence relating to the McGillis Litigation, claiming that any probative value was substantially outweighed by the risk of unfair prejudice. Second, Thurston contends that he was entitled to a directed verdict because the undisputed facts established that the statute of limitations on Bodell's fraud claims began to run as a matter of law before Bodell discovered the McGillis Litigation. Third, Thurston challenges the jury's punitive damages award on due process grounds, claiming that the award was intended to punish him for conduct that formed the basis of the McGillis Litigation. We affirm.

## BACKGROUND

¶2     In 2006, Thurston persuaded Bodell to invest $1.2 million in the development of condominiums in San Francisco, known as 310 Townsend (the 310 Townsend Project). Thurston represented to Bodell that the 310 Townsend Project did not have any current or foreseeable problems. Thurston also told Bodell that he had personally invested over $4 million of his own "cash equity" in the project. Bodell considered it significant that Thurston had "skin in the game" by placing his own money at risk and relied upon that representation in deciding to invest.

¶3     In truth, Thurston had bought his interest in the 310 Townsend Project by borrowing over $4 million from McGillis. To obtain the loan, Thurston misrepresented to McGillis that he was acting on behalf of a group of developers from southern California. McGillis believed that Thurston had vetted the borrowers and paid him a fee for finding and underwriting the loan.

¶4 Before approaching Bodell, Thurston had told McGillis that the southern California developers needed more time to repay the loan because the project was experiencing permit delays and cost overruns. McGillis agreed to extend the loan for a $1.2 million payment. Thurston then asked Bodell to contribute the $1.2 million without disclosing the current problems with the 310 Townsend Project, the existence of the McGillis loan, or the fact that Bodell's investment was needed to extend the McGillis loan.

¶5 After Bodell invested, Thurston provided Bodell's representative with a letter explaining that the 310 Townsend Project was experiencing delays, permit problems, and cost overruns. When Bodell's representative questioned why the project was not as Thurston had represented, Thurston claimed that he was as surprised as Bodell and "had no idea that there were issues like this" when he encouraged Bodell to invest. Thurston told Bodell that they had both been misled. Believing that they were "teammates" and "on the same side," Bodell's representative continued to work with Thurston for several months in an attempt to salvage the investment. But, in 2007, Bodell asked Thurston for its money back. Thurston apologized for not realizing the problems with the 310 Townsend Project and returned a $50,000 premium that Bodell had paid for the opportunity to invest.

¶6 Several years later, Bodell filed this action against Thurston for an accounting and breach of the covenant of good faith and fair dealing. As part of his initial disclosures, Thurston produced documents that referenced the McGillis Litigation. Bodell obtained transcripts from the McGillis Litigation and discovered the existence of the McGillis loan, Thurston's representations to McGillis that the 310 Townsend Project was experiencing delays and cost overruns before Bodell invested, and that Thurston needed $1.2 million to extend the McGillis loan. Upon learning these additional facts, Bodell amended its complaint to allege fraud and fraudulent concealment. Specifically, Bodell alleged that it had been fraudulently induced

into investing in the 310 Townsend Project and would not have invested if Thurston had disclosed all material aspects of the deal.

¶7     Before trial, Thurston filed a motion in limine seeking to exclude "any reference" to the McGillis Litigation. Bodell opposed the motion, arguing that the McGillis Litigation was relevant to its fraud and fraudulent concealment claims. Specifically, in reviewing the McGillis Litigation transcripts, Bodell had learned that Thurston knew of the problems with the 310 Townsend Project at the time he asked Bodell to invest and that Thurston had not invested his own cash equity but instead needed Bodell's investment to secure an extension on the McGillis loan. Bodell argued that this evidence was also relevant to refute Thurston's statute-of-limitations defense because it would show it could not have reasonably discovered the fraud before obtaining the McGillis Litigation transcripts.

¶8     At the pretrial motion hearing, Thurston conceded that evidence of the McGillis Litigation, as it pertained to the 310 Townsend Project and the McGillis loan, was relevant to Bodell's fraud claims and statute-of-limitations argument. Accordingly, Thurston narrowed his motion in limine and sought to exclude only two categories of evidence relating to the McGillis Litigation: (1) the "dozens and dozens" of other transactions at issue in the McGillis Litigation that were unrelated to the 310 Townsend Project and (2) "information concerning the outcome of that case, the verdict, [and] the findings of fact." Bodell indicated that the parties were "largely in agreement on the scope of an order in limine if there's going to be one" but argued that it was unnecessary at this point. The court agreed, indicating that it would rule on objections to the evidence at trial.

¶9     Thurston expressed concern that, without an order in limine, some of Bodell's witnesses, who harbored animus against him, might intentionally blurt out prejudicial information. The court indicated that Thurston's concern could be addressed by having Bodell instruct its witnesses about

"staying on track" and answering only the question posed. Bodell indicated it had already talked to its witnesses and they understood that. Based on those representations, the court denied the motion.

¶10    Bodell's representative was the first witness at trial. When he was asked about the McGillis Litigation, Thurston objected, claiming the evidence was irrelevant and prejudicial. In response, Bodell argued that the testimony was relevant because "[i]t goes to how he discovered the fraud." The court overruled Thurston's objections and allowed the representative to testify as to what "he learned about through the lawsuit," but it directed Bodell's counsel to "be very shallow" in discussing the lawsuit itself.

¶11    Bodell's representative went on to testify that he learned from the McGillis Litigation that Thurston had not invested his own money in the 310 Townsend Project as he represented, that the McGillis loan was the source of the funds, and that Bodell's investment was used to get an extension on that loan. The representative further testified that he learned Thurston had told McGillis that there were problems with the 310 Townsend Project that required an extension of the loan even though Thurston had represented to Bodell that there were no such problems. Thurston objected to this testimony on hearsay grounds, but the court overruled those objections.

¶12    On cross-examination, Thurston questioned the representative about Bodell's responses to certain interrogatories. Specifically, he asked what information Bodell had to support the claim that Thurston had defaulted on the McGillis loan. The representative answered:

> That he was perhaps going to default. I don't know exactly, but yes. I learned through that trial, learned that—that's where I learned about—one of the sources of learning about the big default, I mean the cheating McGillis out of $2 million that

he was successful in winning, a fraud against Mr. Thurston.

Thurston did not object or move to strike the answer as nonresponsive but instead asked the witness to "limit [his] answer to [the] question."

¶13   Bodell requested a sidebar at which it suggested that Thurston "opened the door with that question. He has asked him about the result of the trial however you look at it." The court agreed, stating, "That's precisely what you're doing . . . . You're opening the door to let them bring the trial in." Thurston conceded, "It's in." Thurston explained that this line of questioning was designed to show that there was no support for some of the claims made in Bodell's answers to interrogatories. The court surmised that "this area that [Thurston was] getting into now probably doesn't require [further discussion of] the [McGillis] trial" and allowed Thurston to finish his cross-examination. The court indicated that it would address the matter the following morning outside of the jury's presence.

¶14   When testimony resumed, Thurston again asked about the basis for Bodell's assertion that Thurston was in default on the McGillis loan, specifically asking whether Bodell had any documentation to that effect. Bodell's representative answered, "Well, I'm not aware of anything directly, just what I understood occurred in the McGillis case where they won the fraud judgment against [Thurston] related to this and other investments." Thurston did not object or move to strike this testimony.

¶15   The following morning, Thurston argued that the testimony regarding the outcome of the McGillis Litigation was not only prejudicial but false. He explained that the verdict in the McGillis Litigation was for breach of fiduciary duty, not fraud, and that it was impossible to determine whether the jury's verdict even related to the 310 Townsend Project given the

number of transactions at issue in that case. Thurston explained that he did not move to strike the testimony because he did not want to draw attention to it, but that he did not "know how to unring that bell." The court indicated that it could be remedied with a curative instruction. Going forward, the court ruled:

> I think the other trial certainly does come in, the other trial in terms of discovering what happened and what you discovered from the trial I think comes in. I don't think there's any need to bring the verdict in not the verdict form or anything like that, but if in fact we have to determine when it was that [Bodell] discovered that there were some improprieties, at least the first time he learned that, that's highly relevant with regard to the statute of limitations.

The court reiterated that it would issue a curative instruction regarding the testimony about the McGillis Litigation verdict, stating, "I don't think the result has any relevance here. That said, the proceedings certainly do have relevance because that was when [Bodell] made the discovery" of the alleged fraud. Accordingly, the court ruled that "the details of that trial certainly can come in. The only thing that's not going to come in will be the verdict." Bodell clarified that it could "talk about the parties to the case, the allegations of the case, but not the results of the case." The court confirmed, "Yes. I think that's fair."

¶16 When the jury reconvened, the district court gave the following curative instruction:

> And maybe since it's fresh on the jury's mind, there was a reference yesterday to the result of the other trial we're talking about and that reference not only doesn't appear accurate, but quite frankly it wasn't even supposed to come in this trial. So I would ask you to disregard that. That is not what

happened. So just so you know, if you recall the
reference yesterday, please disregard. If you don't
recall, that's fine.

Thurston did not object to this instruction or request further
relief.

¶17     During the remainder of trial, Bodell elicited testimony on
three occasions regarding the nature of the allegations in the
McGillis Litigation. First, Bodell asked McGillis's managing
partner what claims had been alleged in the lawsuit:

> A:     There were many and I might be missing
> some. One of them was elder abuse. The other was
> contract fraud, fiduciary—
>
> Q:     Breach of fiduciary duty?
>
> A:     Breach of fiduciary duty, fraud, contract,
> elder abuse, maybe misrepresentation. Those are
> the ones that are prevalent in my mind.

Bodell also asked McGillis's bookkeeper whether she knew what
claims were at issue in the McGillis Litigation:

> A:     Claims of fraud, and elder abuse and breach
> of fiduciary duty. Those were a few of them. I think
> there were maybe some more, but those were the
> main ones.
>
>  . . .
>
> Q:     But with respect to the other transaction that
> counsel asked you about that were part of that
> lawsuit, were there similar problems with alleged
> fraud?
>
> A:     Yes.

Finally, in response to Bodell's questions on cross-examination, Thurston acknowledged that he had been "sued for fraud by Mr. McGillis." In all three instances, Thurston raised no contemporaneous objection.

¶18 At the close of Bodell's case-in-chief, Thurston moved for a directed verdict on the ground that the three-year statute of limitations barred Bodell's claims. The court denied the motion. The question was submitted to the jury.

¶19 By special verdict, the jury found that the statute of limitations did not bar Bodell's claims. It also found that Thurston had committed fraud against Bodell, had fraudulently concealed important facts from Bodell, and had made negligent representations to Bodell. Finally, the jury found, by clear and convincing evidence, that Bodell should be awarded punitive damages. The jury awarded Bodell $356,141 in compensatory damages and $7.5 million in punitive damages.

¶20 Thurston filed a motion for judgment notwithstanding the verdict, a new trial, and remittitur. Relevant here, Thurston sought a new trial based on prejudicial evidence admitted regarding the McGillis Litigation; judgment notwithstanding the verdict based on his statute-of-limitations defense; and judgment as a matter of law, a new trial, or remittitur on the punitive damages. The district court denied the motion except as to the remittitur of punitive damages. The district court found the punitive damages excessive, and Bodell accepted a remittitur of punitive damages to $356,141, an amount equal to actual damages. Thurston appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 Thurston first asks this court to determine whether he was deprived of a fair trial when the district court admitted evidence concerning allegations made against him in the McGillis Litigation. "We review a [district] court's decision to admit or exclude evidence under Rule 403 of the Utah Rules of

Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 20, 424 P.3d 897 (quotation simplified).

¶22 We next consider whether Thurston was entitled to judgment as a matter of law based on the statute of limitations. "When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict." *Barrientos ex rel. Nelson v. Jones*, 2012 UT 33, ¶ 9, 282 P.3d 50 (quotation simplified). If the denial of a directed verdict relies upon any underlying legal conclusions, those conclusions are reviewed for correctness. *See Liley v. Cedar Springs Ranch Inc.*, 2017 UT App 166, ¶ 12, 405 P.3d 817.

¶23 Finally, we are asked to determine whether the district court erred in failing to grant a new trial with regard to punitive damages. Failure to grant a new trial is reviewed for an abuse of discretion. *See Barrientos*, 2012 UT 33, ¶ 7 (noting that "because the grant of a new trial is ordinarily left to the sound discretion of the trial court," we review the district court's decision to deny a new trial "under an abuse of discretion standard" (quotation simplified)).

ANALYSIS

I. Evidence Regarding the McGillis Litigation

¶24 Thurston contends that he is entitled to a new trial because the court admitted prejudicial testimony regarding the McGillis Litigation. Specifically, Thurston challenges the admission of testimony concerning (1) the outcome of the McGillis Litigation and (2) the allegations of elder abuse, fraud,

and other claims in the McGillis Litigation. Although Thurston raised these arguments below in a rule 59 motion for a new trial, he has not appealed the district court's denial of that motion. Instead, he asks us to directly review the district court's legal errors at trial. However, he has failed to identify any legal error committed by the district court, much less show that any alleged error was preserved for appellate review.

¶25    With respect to the testimony regarding the outcome of the McGillis Litigation, Thurston has not identified any adverse ruling by the district court for our review on appeal. Before trial, the district court declined to enter a categorical order in limine, but it agreed with Thurston that the results of the McGillis Litigation were inadmissible and cautioned Bodell to instruct its witnesses accordingly. When Bodell's representative unexpectedly testified that McGillis had prevailed against Thurston on its fraud claim, Thurston made no objection or other motion on which the court could rule. Thurston's counsel later explained that his failure to object was a tactical decision to avoid drawing undue attention to the testimony. On appeal, he does not claim that the court plainly erred in declining to intervene sua sponte.

¶26    When the matter was later discussed outside the jury's presence, Thurston did not move the court to strike the testimony, issue a curative instruction, grant a mistrial, or provide any other relief. The court confirmed that the McGillis Litigation verdict was inadmissible and decided, sua sponte, to issue a curative instruction. That instruction not only informed the jury that the testimony regarding the McGillis verdict was inadmissible and should be disregarded but also stated that the testimony "doesn't appear to be accurate" and "is not what happened." Thurston did not object to this curative instruction as insufficient or request any other relief. Thurston does not allege that the district court plainly erred in failing to do more.

¶27    Rather than take issue with the district court's rulings, Thurston suggests that the "error" arose when Bodell's representative violated the district court's directive not to

discuss the outcome of the McGillis Litigation.[2] He asks us to review the prejudicial effect of that violation without regard to the district court's rulings.[3] "Appellate courts review the decisions of lower courts. We do not review the actions of counsel—at least not directly." *State v. Hummel*, 2017 UT 19, ¶ 107, 393 P.3d 314. Nor do we "review the trial record in a search for an idealized paradigm of justice." *State v. Thornton*, 2017 UT 9, ¶ 49, 391 P.3d 1016 (explaining that "American courts have long followed the 'writ of error' approach to appellate

---

2. On appeal, Thurston also alleges that Bodell "doubled down" by referring to this stricken testimony when counsel argued in closing that Thurston "defrauded Mr. McGillis and lied to him about being the borrower on the 310 Townsend loan" and when he urged the jury not to let Thurston "do to you what he did to Mr. McGillis to the tune of $2.4 million." Bodell maintains that this argument was based on Thurston's own admissions during the trial in this case. We need not decide whether this was proper argument, because Thurston made no contemporaneous objection and has not argued on appeal that the court plainly erred by not intervening sua sponte.

3. Thurston asserts that *Wilson v. IHC Hospitals, Inc.*, 2012 UT 43, 289 P.3d 369, supports such an approach. We disagree. In *Wilson*, the Utah Supreme Court held that counsel's repeated violation of an order in limine categorically excluding evidence of collateral source benefits was sufficiently prejudicial to warrant a new trial. *Id.* ¶ 29. But, unlike in this case, the issue in *Wilson* was properly preserved. As the court noted, "[o]n the fourth day of trial, when IHC asked Mr. Wilson about the amount of out-of-pocket expenses his family had incurred in purchasing Jared's wheelchair, the Wilsons objected, arguing 'this [is] a direct violation of the Court's order.'" *Id.* ¶ 29 n.6. The court held that "[t]his objection was both timely and sufficient to preserve the collateral source issue for appeal." *Id.* In contrast, Thurston failed to make a timely objection to the testimony in such a way that the court could rule on it.

review"). Our role as an appellate court is to review "specific rulings made by the trial court." *Wing v. Still Standing Stable LLC*, 2016 UT App 229, ¶ 17, 387 P.3d 605 (quotation simplified). In other words, "[w]e ask only whether the trial court committed a reversible error in resolving a question presented for its determination." *Thornton*, 2017 UT 9, ¶ 49.

¶28    Here, Thurston has not challenged any specific district court ruling nor has he invoked an exception to the preservation requirement by arguing that the district court plainly erred in failing to take further action sua sponte. Instead, by asking us to directly review the prejudicial effect of the testimony without regard to the district court's rulings, Thurston attempts "an end-run around the law of preservation (and the doctrine of plain error review)." *Hummel*, 2017 UT 19, ¶ 112.

¶29    Thurston takes a similar approach in challenging testimony identifying the specific claims at issue in the McGillis Litigation. Although Thurston originally moved for an order in limine excluding "any reference" to the McGillis Litigation, he later conceded that evidence of the McGillis Litigation was relevant and admissible so long as it concerned the 310 Townsend Project. By the time of trial, Thurston had abandoned his motion in limine except with respect to evidence regarding the McGillis Litigation verdict and information about unrelated investments at issue in that case.[4]

¶30    The court's midtrial ruling was consistent with Thurston's modified position. While the court excluded evidence regarding the verdict, it ruled that the allegations in the McGillis Litigation were admissible to prove what Thurston knew and represented to others at the time he induced Bodell's investment and when

---

4. Thurston does not argue that the claims of fraud, elder abuse, and misrepresentation in the McGillis Litigation were unrelated to the 310 Townsend Project.

Bodell learned of those facts. Thurston voiced no objection and sought no clarification of the court's ruling.

¶31 Nor did he object when Bodell asked witnesses to name the specific legal claims at issue in the McGillis Litigation. Three witnesses each testified that the lawsuit involved fraud claims, and two of those witnesses mentioned additional claims of elder abuse and breach of fiduciary duty. The district court had no opportunity to rule on the relevance of this specific testimony because Thurston made no contemporaneous objection.

¶32 "When an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of [the preservation] exceptions to persuade an appellate court to reach that issue." *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. Here, Thurston has not argued, let alone established, a valid exception to the preservation requirement that would justify reaching this unpreserved issue.

## II. Statute of Limitations

¶33 Thurston challenges the district court order denying his motion for a directed verdict. He argues that he was entitled to judgment on Bodell's fraud and fraudulent concealment claims because the undisputed facts established that the statute of limitations barred those claims. Specifically, Thurston contends that the three-year limitation period for fraud claims began to run in 2007 when Bodell, having determined that the 310 Townsend Project was not proceeding as represented, demanded a return of its investment. Thurston argues that Bodell admittedly had knowledge of facts that could form the basis of a cause of action, triggering the statute of limitations as a matter of law. Because this action was not brought within three years of that date, Thurston contends that he was entitled to a directed verdict.

¶34 The relevant statute of limitations for fraud claims provides that the "cause of action does not accrue until the discovery by the aggrieved party of the facts constituting the

fraud or mistake." Utah Code Ann. § 78B-2-305(3) (LexisNexis 2012). This statutory discovery rule tolls the running of the three-year limitations period until the date a plaintiff either discovers or should have discovered the fraud claim. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 23, 108 P.3d 741. "[T]he determination of when the aggrieved party reasonably should have known of the facts forming the basis of the party's fraud claim is a question of fact." *Shiozawa v. Duke*, 2015 UT App 40, ¶ 14, 344 P.3d 1174. "Indeed, at what point a party should have reasonably discovered its claim is a fact-intensive inquiry that precludes judgment as a matter of law in all but the clearest of cases." *Id.* (quotation simplified).

¶35   This is not one of those rare cases in which the defendant was entitled to judgment as a matter of law. Bodell presented sufficient evidence to support a finding that it did not reasonably discover its fraud claims until after it learned of the McGillis Litigation from Thurston's initial disclosures. Bodell's representative testified that he first discovered the facts underlying the fraud claims by reviewing the transcripts of the McGillis Litigation. Specifically, he learned that Thurston had not invested his own cash equity in the 310 Townsend Project but instead had funded his investment by borrowing money from McGillis, that Thurston knew that the 310 Townsend Project was experiencing cost overruns and delays in obtaining permits and had cited those problems as justification for an extension on the McGillis loan, and that Thurston needed $1.2 million to secure the extension when he approached Bodell about investing. Based on this evidence, the jury could have reasonably concluded that until Bodell learned of these facts from the McGillis Litigation, Bodell could not have reasonably discovered that Thurston had concealed and misrepresented these facts to induce the investment.

¶36   Thurston maintains that Bodell's admission that, "by 2007, [it] had determined that the project was not as represented to [it] by Thurston" placed it on notice that it had some type of claim for misrepresentation. Thurston argues that, "[w]hile

Bodell might not have known all of the alleged misrepresentations, or whether they were intentional or not, it knew that it had a potential claim—hence the demand for return of funds." But Bodell's discovery that the 310 Townsend Project was not as represented did not necessarily put it on notice that it had a claim against Thurston. Bodell's representative testified that Thurston denied prior knowledge of the problems and claimed that he had also been misled. In fact, Bodell's representative testified that he continued to work with Thurston because Thurston led him to believe that they were "on the same side" and had both been similarly wronged. Based on this evidence, the jury could have reasonably concluded that Bodell had no basis to question Thurston's representation or to suspect him of any wrongdoing until Bodell learned from the McGillis Litigation transcripts that Thurston had cited the permit problems and cash overruns as justification to extend the McGillis loan before approaching Bodell to invest.

¶37   The facts of this case were susceptible to different interpretations that precluded judgment as a matter of law on whether the discovery rule tolled the statute of limitations for fraud. The district court properly submitted to the jury the factual question of when Bodell should have reasonably discovered the basis for its claims. Accordingly, we affirm the denial of Thurston's motion for a directed verdict.[5]

### III. Punitive Damages

¶38   Thurston contends that the punitive damages award violates due process because the award was designed to punish Thurston for his actions toward McGillis, a nonparty, rather than for his actions toward Bodell. Thurston argues that there was a

---

5. To the extent Thurston also challenges the district court's denial of its motion for judgment notwithstanding the verdict, we affirm that ruling for the same reasons.

"steady drumbeat throughout trial regarding Thurston lying to Mr. McGillis, abusing Mr. McGillis, [and] getting rich off of Mr. McGillis," which "could not have been ignored by the jury." Thurston contends that because the district court did not protect him against the risk that the jury would punish him for the alleged injury inflicted upon McGillis, "the award of punitive damages cannot stand and a new trial must be granted."

¶39 Under Utah law, a jury may award punitive damages if it awards compensatory damages and finds "by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious *or intentionally fraudulent conduct*, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201(1)(a) (LexisNexis 2012) (emphasis added). In finding by clear and convincing evidence that Thurston committed fraud on Bodell, the jury necessarily made a finding of intentionally fraudulent conduct sufficient to support an award of punitive damages. But, to satisfy due process, such an award must relate to the harm Bodell suffered and cannot be used to punish Thurston for harm caused to others.

¶40 In *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), the United States Supreme Court held that allowing punitive damage awards to punish a defendant for injury inflicted on a nonparty would violate procedural due process. *Id.* at 356–57. The Court clarified that the jury is allowed to consider harm to others in determining the reprehensibility of the defendant's conduct, but "a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 355. Where the risk of jury confusion is significant, "a court, upon request, must protect against that risk." *Id.* at 357. While the Supreme Court allowed the states "some flexibility to determine what *kind* of procedures they will implement, federal constitutional law obligates them to provide *some* form of protection in appropriate cases." *Id.*

¶41　In response to *Philip Morris*, the Utah Supreme Court modified its long-standing rules on punitive damages. *See Westgate Resorts, Ltd. v. Consumer Prot. Group, LLC*, 2012 UT 55, ¶¶ 13–14, 285 P.3d 1219. Previously, in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), the court had articulated factors to be considered in assessing punitive damages. *Id.* at 808. Relevant here, the fourth *Crookston* factor was "the effect [of the alleged misconduct] on the lives of the plaintiff and others." *Westgate Resorts*, 2012 UT 55, ¶ 13 (quotation simplified). The *Westgate* court held that this factor "must be modified to be constitutionally accurate," by clarifying that harm to others "may only be used to assess reprehensibility," not "to directly punish a defendant for harm caused to nonparties." *Id.* ¶¶ 14, 23. To implement that decision, our supreme court directed that "[j]ury instructions should now include an explanation that 'harm to others' may be considered for reprehensibility only, and not for punishment." *Id.* ¶ 23.

¶42　In accordance with *Philip Morris* and *Westgate Resorts*, the jury instructions in this case protected against the risk that the jury would improperly award punitive damages to punish Thurston for harm allegedly caused to McGillis. Thurston proposed the punitive damages instructions that were given to the jury. Those instructions specifically advised the jury that the amount of punitive damages "must bear some relationship to Plaintiff's harm." The exclusive list of factors that the jury was allowed to consider in determining the amount of punitive damages omitted any reference to "harm to others." Instead, the fourth *Crookston* factor was limited to "the effects of the Defendant's conduct on the Plaintiff." By entirely eliminating "harm to others" as a permissible consideration, the instructions protected against any confusion regarding the permissible use of that factor.

¶43　Thurston does not address how the jury instructions were inadequate to "protect against the risk that the jury might improperly consider harm to McGillis in deciding to award punitive damages." The court did not explicitly instruct the jury

that it could *not* punish Thurston for harm he caused to others. But, unlike the defendant in *Philip Morris*, Thurston did not request such an instruction. 549 U.S. at 356; *see also Westgate Resorts*, 2012 UT 55, ¶ 22 (holding that "an objection lodged with a trial court based on a plaintiff's suggestion that the jury calculate punitive damages by assessing the damage caused to nonparties suffices to serve as a 'request' under *Philip Morris*"). In the absence of such a request, there was no need for the court to go beyond the law as correctly stated in the jury instructions Thurston proposed.

¶44 There was no significant risk that the jury based the punitive damages award on the harm Thurston allegedly caused McGillis. Because Thurston failed to establish a procedural due process claim, the court acted within its discretion in denying his motion for a new trial.

CONCLUSION

¶45 Thurston has failed to establish any error in the district court's evidentiary rulings or in its denial of his motion for a directed verdict. He has also failed to show a significant risk that the jury improperly based its punitive damages award on harm Thurston allegedly caused against a nonparty. Accordingly, we affirm the judgment.

———————